Dennis A. WALTERS, Jr., Plaintiff,

v.

CITY OF ATLANTA; Andrew J. Young, individually and in his official capacity as Mayor, City of Atlanta; Shirley C. Franklin, individually and in her official capacity as the Chief Administrative Officer to the Mayor; Clara H. Axam, individually and in her capacity as Commissioner, Department of Administrative Services, City of Atlanta; Geraldine H. Elder, individually and in her official capacity as Commissioner, Department of Parks and Recreation, City of Atlanta, Defendants.

Civ. A. No. C83–1432A.

United States District Court,
N.D. Georgia,
Atlanta Division.

May 28, 1985.

See also 610 F.Supp. 730.

Dana E. McDonald, Atlanta, Ga., for plaintiff.

Kendric E. Smith, Marva Jones Brooks, Overtis Hicks Coopwood, Atlanta, Ga., for defendants.

## ORDER

### FINDINGS OF FACT AND CONCLUSIONS OF LAW ON TITLE VII CLAIMS

SHOOB, District Judge.

This is an action under 42 U.S.C. §§ 1981 and 1983, and under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Plaintiff, a white male, alleges that he has been denied employment as Director of the Atlanta Cyclorama, a special facility maintained by the City of Atlanta that contains a dioramic display of scenes from the Battle of Atlanta during the War Between the States. Plaintiff claims that the City of Atlanta and the individual defendants illegally discriminated against him on the basis of his race and sex, and in retaliation for charges filed by him with the Equal Employment Opportunity Commission ("EEOC") and for this lawsuit.

The case was tried to a jury from March 25, 1985, to April 5, 1985, upon plaintiff's claims under 42 U.S.C. §§ 1981 and 1983. The jury served in an advisory capacity on the Title VII claims. Trial was bifurcated, pursuant to Rule 42(b), Fed.R.Civ.P., with the issue of defendants' liability heard first. Evidence was presented during the week of March 25, and on April 1 the Court charged the jury. Jury deliberations began on April 2. On April 3 the jury returned its liability verdict in plaintiff's favor upon his section 1981 racial discrimination claims. Responding to interrogatories, the jury found that defendants discriminated against plaintiff on account of his race on four separate occasions from 1981 to 1983. It also found that on three occasions defendants had retaliated against plaintiff for filing charges with the EEOC and for filing this lawsuit. The jury found for defendants upon plaintiff's claims under 42 U.S.C. § 1983 for discrimination on the basis of gender.

On April 4, 1985, the parties presented evidence to the jury concerning damages. Afterwards the Court, out of the presence of the jury, heard evidence concerning plaintiff's request that he be placed in the position of Cyclorama Director. At the conclusion of that hearing the Court, agreeing largely with the jury's advisory opinion as to Title VII liability, ruled in plaintiff's favor on his Title VII racial discrimination claims and determined that plaintiff would be installed as Cyclorama Director.

The Court did not at that time order plaintiff's immediate installation as Cyclo-

rama Director. The parties agreed, however, during the damages charge conference on April 5 that plaintiff would be entitled to front pay between April 4 and the date the plaintiff was placed in office.

On April 5, 1985, the jury awarded damages for plaintiff on his section 1981 claims as follows:

—against the City of Atlanta: $61,000 in back pay and $115,000 for mental distress;

—against Andrew J. Young: $10,000 for mental distress and $2000 punitive damages;

—against Shirley C. Franklin: $10,000 for mental distress and $2000 punitive damages;

—against Clara G. Axam: $5000 for mental distress and $1000 punitive damages; and

—against Geraldine Elder: $9500 in back pay, $10,000 for mental distress, and $2000 punitive damages.

(The Court has determined back pay due plaintiff under Title VII independently of the jury's response; that determination, set out below at page 728, duplicates the jury's back pay award under section 1981.) The jury found defendant Elder separately liable for a portion of the back pay because it found that she alone, and not the City, was responsible for the first of several instances of discrimination.

Following the jury's damage verdict on April 5, the parties conferred with the Court regarding entry of judgment. Plaintiff requested that judgment be entered on April 5 upon the jury verdict. Defendants requested that the Court delay entry of judgment until the final order incorporating findings of fact and conclusions of law was entered on the Title VII claims. Defendants argued that entry of one judgment upon all claims at the same time would lessen confusion about time for appeal. Plaintiff agreed to the delay in the entry of the section 1981 judgment upon defendants' agreement that interest would accrue on the verdict from April 5, 1985.

Because there was a dispute regarding the appropriate method for calculating interest upon plaintiff's prejudgment back pay, the parties agreed that the Court would resolve this issue upon argument and evidence to be submitted.

The Court directed that plaintiff submit proposed findings of fact and conclusions of law upon the Title VII claims in accordance with Local Court Rule 220–7. Defendants did not respond in detail to the proposed findings and conclusions, which included calculations of back pay, front pay, and interest. Defendants' counsel, responding to a later query from the Court, stated that the City had no objection to plaintiff's calculations except that the City disputed the length of the back-pay period and the amount of interim earnings plaintiff could reasonably have gained.

The Court has adopted plaintiff's proposed findings and conclusions with modifications.

### Findings of Fact

1. The City of Atlanta owns a large dioramic painting called the "Cyclorama," which depicts scenes from the Battle of Atlanta in the War Between the States. The painting, which was housed in a large building in Grant Park for a number of years, gradually deteriorated, and the City of Atlanta ("City") undertook the restoration of the painting and the building in which it was housed during the administration of former Mayor Maynard Jackson. In order to accomplish this restoration the City issued revenue bonds earmarked for the improvements made to the building, and the facility was closed for a period of several years while the restoration was being accomplished. During this time the Cyclorama facility did not have an operating staff, and the position of Director was vacant.

2. Approximately a year before the Cyclorama's reopening in June 1982, the Department of Parks, Recreation and Cultural Affairs of the City requested that the City's Personnel Director, defendant Clara H. Axam (now Commissioner of the Department of Administrative Services), es-

tablish a "register" (also known as "eligible register") for the position of Cyclorama Director. A "register" is a list of those persons selected by the Personnel Department from all the applicants for a position as being eligible for appointment because of their qualifications. Persons on the register are rated "highly qualified," "well qualified," or "qualified." Under the City's civil service system those applicants who are chosen to be on the eligible register are interviewed by an interview panel, which makes recommendations to the head of the department, in this case the Commissioner of Parks, Recreation and Cultural Affairs. The final hiring decision is made by the Commissioner, who until April 1983 was defendant Geraldine H. Elder.

3. The position vacancy for the Director's job was advertised from September 2 through September 11, 1981. The advertised starting salary was $1,477 per month or $17,724 per annum. The Personnel Department described the job qualifications in part as follows:

*Knowledge, Skills, and Abilities*: Thorough knowledge of the history of Atlanta and the surrounding area, including the Civil War battles. Good knowledge of the theory, practices, and techniques of historic preservation. Some knowledge of general business practices and of keeping financial records. Some knowledge of the field of public relations. Ability to prepare exhibits and plan programs for the general public; ability to speak and write clearly and concisely; ability to establish and maintain effective working relationships with others. Ability to learn and keep abreast of State and Federal regulations regarding the operation of public buildings.

4. Twenty-seven persons submitted applications. Twelve of them were black and fifteen were white.

5. Plaintiff Dennis A. Walters, Jr., was one of seven applicants selected for the eligible register established on September 22, 1981. Walters was rated "well qualified" by the Personnel Department. The register was forwarded on September 23,

1981, to the Department of Parks, Recreation and Cultural Affairs for the selection of a Director. The seven persons on this first, or 1981, register were then interviewed by the panel assembled for that purpose on October 12 and 13, 1981. The interview panel included two white and two black voting members, one of whom was the City's affirmative action officer. A non-voting white member, Franklin Garrett, official historian of the Atlanta Historical Society, was also present for technical advice to the panel. All of the seven eligible candidates on the register were white.

6. Plaintiff testified that he had wanted to work at the Cyclorama from a very young age, after he had visited the facility. He testified that he had geared his studies with a view toward gaining the skills necessary to become its director.

7. Plaintiff was employed for more than five years by the North Carolina Department of Archives and History as a conservator at the North Carolina Museum of History in Raleigh, North Carolina. He was also previously employed as a state preservationist with the Georgia Historical Commission, Atlanta, Georgia.

8. Plaintiff later worked for Georgia State University in Atlanta. Plaintiff's supervisor there was Lois J. Secrist. Ms. Secrist testified that plaintiff had been a good employee who got along well with those he had supervised and with whom he had worked.

9. Based upon the interviews and upon the criteria for the job as published in connection with the establishment of the register, plaintiff was found to be one of the three "best qualified" applicants from among the seven "eligible register" candidates for the job. The names of the three best qualified applicants were then forwarded to Commissioner Elder for her consideration on or shortly after October 13, 1981, the date on which plaintiff was interviewed by the panel.

10. Commissioner Elder interviewed the three finalists on this first register shortly after the panel interview.

11. Commissioner Elder asked the interview panel members about the race of the seven persons on the eligible register. She had not interviewed and had not otherwise known the race of the four persons on the eligible register who were not referred to her for selection.

12. The September 22, 1981, register was, under the City's rules and regulations, valid for six months; only persons on the register could be hired to fill the Cyclorama Director position during the six-month period.

13. Commissioner Elder decided to select no one from the September 22, 1981 register. On December 21, 1981, Elder requested a new register for the following reasons, as stated in a memorandum written by her to defendant Clara Axam, then the Director of Personnel and now Commissioner of Administrative Services:

1. The current register, dated 9–22–81, does not include any minority group representation. A new register would help remedy this situation.

2. The top three (3) candidates recommended to me by the interview panel, Jody Cook, Robert Jones, and Dennis Walters, although qualified, I am concerned about the extent of their expertise in business administration and management which is critical to the Cyclorama becoming a self-sufficient tourist attraction.

If the goal of self-sufficiency is to be accomplished, clearly a background in history, museum studies, art, or even the Civil War battles themselves, becomes secondary to expertise in business management and finance.

14. In establishing in 1981 the new position of Cyclorama Director, in recruiting candidates for the position, and in conducting interviews, the City properly followed its civil service procedures. The first register expired on March 22, 1982, after it had been in effect for six months.

15. The Court finds that plaintiff was the most qualified of the applicants for the post in 1981 and that plaintiff would have been hired but for the illegal discrimination. The interview panel convened to assess the top seven candidates reached a consensus in placing plaintiff among the top three best qualified. Mr. Fanstill, one of two voting members of the interview panel to testify in this action and the only one to discuss his evaluation of the candidates, testified that he regarded plaintiff as the best applicant for the job. Mr. Fanstill also testified that he had gained the impression from defendant Elder that plaintiff was likely to be named as Director. While the testimony of defendant Elder herself at trial was that she would have preferred another of the top three candidates, the Court gives greater weight at this juncture to the more disinterested testimony of Mr. Fanstill in resolving the conflict of evidence.

16. Effective March 30, 1982, eight days after the expiration of the register established in 1981, and before the June 1 reopening of the Cyclorama to the public, defendants appointed a black female, Carol J. Pinkney, to be Director of the Cyclorama on a provisional basis. Ms. Pinkney had not applied for the Cyclorama Director position during September 1981 and was not on the original register of eligible applicants.

17. Carol J. Pinkney had been the Executive Director of the YWCA of Atlanta from November 1, 1977, to March 21, 1981.

18. Carol J. Pinkney was terminated from her position by the YWCA Board of Directors in March 1981 because of her performance and because of an audit report that revealed unauthorized charges for her automobile and salary discrepancies.

19. From June 1, 1981, to December 31, 1981, Carol J. Pinkney was employed by the campaign organization of defendant Andrew Young in the mayoral election. She received $1,200 per month as a volunteer coordinator in connection with the campaign of defendant Young.

20. Defendant Andrew Young was elected Mayor of Atlanta in late October 1981. Ms. Pinkney remained on the cam-

paign payroll as a "transition team" member.

21. Defendant Shirley C. Franklin, presently Chief Administrative Officer to the Mayor, learned of Ms. Pinkney's termination by the YWCA during the summer of 1981 when Ms. Pinkney was working on the campaign staff of defendant Young.

22. Carol J. Pinkney was hired by the City on January 19, 1982, as an administrative assistant in the Mayor's office. Her salary was $709.20 biweekly, which amounted to $1,536.60 per month or $18,439.20 annually.

23. Carol J. Pinkney's initial salary with the City ($1,536.60 per month) represented a 28 per cent increase over her salary with the Young campaign staff.

24. Ms. Pinkney's office was located on the second floor of City Hall near the offices of both defendant Mayor Young and defendant Franklin.

25. On March 19, 1982, eleven days before she was appointed provisional Cyclorama Director, Carol J. Pinkney filed a lawsuit in Fulton County, Georgia, Superior Court against members of the YWCA Board for wrongful discharge arising from her March 1981 termination.

26. Upon her provisional appointment as Cyclorama Director effective March 30, 1982, Ms. Pinkney's salary increased to $761.30 biweekly, equivalent to $1,649.48 per month or $19,793.80 annually.

27. Mary L. Vance, a white female, was temporarily performing the job functions of Associate Director of the Cyclorama effective March 30, 1982.

28. Ms. Vance had not applied for the Cyclorama Director's position during September 1981 and was not on the original register of eligible applicants.

29. Dennis A. Walters, Jr., was not considered for the provisional appointment which Carol J. Pinkney received or for the provisional appointment as Associate Director which Mary Vance received.

30. The City had a policy of preferring transition team members for provisional appointments at this time as a means of bringing its new team to city administration.

31. Eleven persons on Mayor Young's "transition team", including Ms. Pinkney, received provisional appointments. The name, race and sex of those persons are:

| Name | RACE/SEX |
| --- | --- |
| Arlon Kennedy | BM |
| Tsgaye Taye | BM |
| Carol Pinkney | BF |
| Melinda Bullard | WF |
| Clarence Walker | BM |
| Marion Jones | BF |
| Muriel Francis | BF |
| Barbara Barnes | WF |
| Mary Vance | WF |
| Jackqueline Wade | BF |
| Dexter Wise | BM |

As is evident from the list, not one was a white male.

32. On May 20, 1982, plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission, alleging that he was the best qualified applicant for the job and that the City's failure to hire him was due to his race (white) and sex (male). After several months, the District Director of the Equal Employment Opportunity Commission determined that plaintiff's charges were well founded, stating:

> The evidence of record shows that the Charging Party [Dennis A. Walters, Jr.] applied and qualified for the instant position advertised. Charging party was more qualified that the two females who were hired on a temporary basis. Further, by Respondents['] admission the Charging Party was not selected because there were no minorities on the list of certification, although the position had been properly advertised and processed.

The plaintiff received a "right to sue" letter from the Department of Justice on April 23, 1983, and filed his complaint within the statutory period.

33. Ms. Pinkney's tenure as provisional Cyclorama Director was not satisfactory. In May 1982, she obligated the City to an advertising and promotional firm without complying with proper purchasing proce-

dures. Resolution of the $20,000 obligation required special action of the Atlanta City Council to ratify and approve the expenditure.

34. Carol J. Pinkney was abruptly relieved of her duties as provisional Cyclorama Director on November 4, 1982.

35. On her last day of work as provisional Director, Carol J. Pinkney was escorted from the Cyclorama by her supervisor, James Murphy, at the direction of defendant Elder, the Commissioner of Parks and Recreation.

36. On November 8, 1982, four days after her termination, Ms. Pinkney met with defendant Andrew J. Young, and was advised that an attempt would be made to find Ms. Pinkney other employment.

37. Notwithstanding her November 4, 1982, termination, Ms. Pinkney was rehired by the City in its Community Development Department.

38. The Cyclorama Director position remained vacant from November 4, 1982 until a permanent appointment was made in March 1983.

39. On July 22, 1982, the City of Atlanta announced permanent job openings for Cyclorama Director and Associate Director.

40. On the day the position was announced, someone other than Carol J. Pinkney filed an application on Ms. Pinkney's behalf for the Director's position.

41. Following the City's receipt of job applications upon the July 22, 1982 job announcement for Cyclorama Director, the City established a new eligible register for the position of Cyclorama Director on September 17, 1982.

42. One of the applicants was David R. Palmer, a black male.

43. Mr. Palmer had been employed as the City's Water Service Administrator from December 9, 1980, to July 8, 1981. He was dismissed for poor performance.

44. Palmer's July 1981 performance evaluation report noted the following specific examples of performance deficiencies:

Failure to accept written delegation of responsibility for vehicle assigned to the section and provide required trip tickets. Continued failure to respond to written requests for information and actions.

Continued failure to accept responsibility for correct preparation of credit adjustment petitions.

Does not resolve customer service problems and delinquent account collections within Ordinance guidelines, at his level.

Has not acquired job knowledge expected of individual in this position during this period of time.

Issuing instructions to a subordinate to perform a wrongful act.

45. Shortly after Palmer's 1981 termination as Water Service Administrator, City officials learned that Palmer, while employed full-time for the City as its Water Service Administrator, had also been employed full-time with the Georgia Department of Labor.

46. Palmer applied for the Cyclorama Director and Associate Director positions on August 3, 1982.

47. On September 15, 1982, Palmer was rated not qualified for the Cyclorama Director position.

48. Mr. Palmer appealed the determination that he was not qualified for the Cyclorama Director position. On September 29, 1982, the rating was changed from "not qualified" to "qualified."

49. The basis for the change to "qualified" was stated to be Palmer's marketing experience with Heinz Company. The reassessment was the result of a review of Palmer's resume. That resume indicated that, during the period July 1970 to July 1972, Mr. Palmer worked as an associate venture manager and product assistant for the H.J. Heinz Company, assigned to the vinegar and salad dressing product group.

50. Plaintiff Dennis A. Walters, Jr., was again rated "well qualified" by the Personnel Department for both the Cyclorama Director and Associate Director positions based upon his application and supporting documentation.

51. Plaintiff's rating of "well qualified" on the September 17, 1982, Cyclorama Director register was based upon an assessment of his credentials in light of a revised position description adopted in June 1982.

52. A panel was convened to interview candidates on the September 17, 1982, register, including plaintiff. On October 14, 1982, in a memorandum to defendant Elder, plaintiff was identified as one of the top three candidates from among the thirteen candidates interviewed. David Palmer was not among the top three candidates.

53. Ms. Pinkney was specifically excluded from the finalists on that register for the following stated reasons:

1. She is not particularly interested in the job. She didn't want it in the first place, has said that she does not believe in what Cyclorama stands for (which is certainly her right, but not conducive to an enthusiastic performance), and did not intend to interview for the permanent appointment. When asked about this during the interview, she acknowledged it, said that she thought she really belonged in community relations, but that Shirley Franklin had asked her to interview.

2. Her performance has not been equal to her credentials. While she worked under difficult circumstances (a rushed opening, a new building, new staff, etc.), nevertheless there have been a number of problems which should never have occurred: the Brown-Olmstead fiasco; the 22,000 in invoices stuck in a desk drawer and never processed; the Disco for History (my term); the problem with CRI; and the general aura of loose management (phones off the hook, dubious overtime, top level staff not on site, etc.).

3. Ms. Pinkney seems to have no particular regard for the chain of command, but rather tends to deal directly with the CAO. Naturally, her allegiance is to the administration which she worked to elect. Nevertheless, her readiness to go beyond the normal constraints of the chain of command cause others to hesitate in offering suggestions, criticism, or rebukes, however justified they may be.

54. On October 25, 1982, defendant Elder decided to "hold" both the Cyclorama Director and Cyclorama Assistant Director registers.

55. A second round of interviews for Cyclorama Director was conducted during the first week in December 1982. Palmer was interviewed on December 2, 1982.

56. Mr. Palmer had been dismissed by the State of Georgia on November 25, 1982, just one week before his interview for the Cyclorama Director position.

57. The State of Georgia assigned the following reasons for terminating Mr. Palmer in November 1982:

1. Conduct reflecting discredit on the department in that on many occasions employers have complained of your discourteousness, arrogance and rudeness when making inspections for the Georgia Department of Labor, Inspection Division.

2. Inefficiency in performing assigned duties in that you falsified reports regarding the Atlanta Dispatch Distributors, Inc. Your report stated you spent one hour and fifteen minutes to complete your inspection. Statements from this company indicate that you made no inspection. Incidents of falsified reports are many with written statements to substantiate.

58. David Palmer was hired as Cyclorama Director in March 1983.

59. Palmer was hired by Commissioner Elder.

60. Before hiring Palmer, Commissioner Elder had been advised by Commissioner Chester Funnye of Palmer's 1981 termination by the City and of his dual employment status.

61. Elder was also advised of Mr. Palmer's termination at the Water Department by Robert Rivers, who testified that he told Commissioner Elder that Palmer had resigned "under siege."

62. In May 1983, while David R. Palmer was serving as Cyclorama Director for the

City, the State of Georgia reinstated Mr. Palmer to his position in the Georgia Department of Labor.

63. He held the full-time job with the State of Georgia while serving the City as Cyclorama Director, in violation of City regulations.

64. On June 29, 1983, David R. Palmer was fired from his position as Cyclorama Director by Carolyn Boyd Hatcher, the present Commissioner of the Department of Parks, Recreation and Cultural Affairs, because of what she determined to be Palmer's inadequate job performance.

65. On July 18, 1983, plaintiff filed a new charge of discrimination with the Equal Employment Opportunity Commission, naming the City of Atlanta as a respondent regarding the selection on March 17, 1983, of Palmer, a black male, to be Cyclorama Director. On January 26, 1984, this charge was amended to include the selections of two white females as Director and Associate Director of the Cyclorama.

66. Following the August 15–16, 1983 hearing upon plaintiff's motion for a preliminary injunction, the City again advertised the Director and Associate Director positions. Plaintiff again applied and was interviewed. Defendants selected Carole Mumford, a white female, to be the Cyclorama Director, and Pam Apple, a white female, to be the Associate Director, effective November 18, 1983.

67. Neither Ms. Mumford nor Ms. Apple had applied for the job in 1981. Ms. Apple applied for neither the Director's nor the Associate Director's position advertised from July 22 to August 5, 1982. Ms. Mumford applied for both these positions in 1982 and was rated "qualified" for both positions by the City's Personnel Department. Plaintiff was rated "well qualified" on both of those registers.

68. On March 2, 1984, the EEOC, in a letter of determination, found that there was reasonable cause to believe that the City of Atlanta discriminated against plaintiff on account of his race and in retaliation for filing his first charge of May 20, 1982.

As a part of that determination, the EEOC concluded:

The Charging Party applied with Respondent for the position of Director of the Cyclorama three consecutive times and for the position of Assistant Director one time. The Respondent hired two less qualified Blacks and one less qualified white female to fill the Director position and a less qualified female to fill the Assistant Director position during the time period of May, 1982 to the present, 1984.

Therefore based on documents presented there is reasonable cause to believe the Respondent discriminated against the Charging Party in retaliation for his previous charge and, in part, because of his race.

On April 19, 1984, the United States Department of Justice issued plaintiff a notice of right to sue. Within ninety days of the issuance of that notice an amended complaint was filed.

69. Plaintiff proved that, had he been hired as Cyclorama Director on November 1, 1981, he would have earned in salary and fringe benefits the following amounts through March 31, 1985:

| | | |
|---|---|---|
| a. | 1981: | $ 3,823.07 |
| b. | 1982: | 25,113.80 |
| c. | 1983: | 27,687.91 |
| d. | 1984: | 28,971.75 |
| e. | 1985: | 7,479.13 |
| | Total | $93,075.66 |

70. Plaintiff actually earned the following amounts between November 1, 1981, and March 31, 1985:

| | | |
|---|---|---|
| a. | 1981: | NONE |
| b. | 1982: | NONE |
| c. | 1983: | $ 4,150.00 |
| d. | 1984: | 14,400.00 |
| e. | 1985: | 3,900.00 |
| | Total | $22,450.00 |

Plaintiff's explanation for his lack of income for part of 1981 and for all of 1982—that he devoted all that time to obtaining the Director's position and that, because he expected in good faith to receive the appointment, he felt it improper to accept other employment under the pretense that

he intended to be a long-term employee—was credible in the circumstances of this case and satisfied the Court. Plaintiff has shown a remarkable degree of patience and endurance in bringing this suit to its conclusion; he has shown far greater persistence in attaining his goal than other plaintiffs who have come before this Court.

71. As of April 1, 1985, plaintiff earned $1,300 per month at Fulton Hardware Store. He receives no fringe benefits other than his employer's required contribution for social security. Had he been employed as Cyclorama Director on November 1, 1981, his earnings with the City of Atlanta as of April 1, 1985, would have been as follows:

| | |
|---|---|
| Salary: | $2,060.00 per month |
| Benefits: | 606.05 per month (29.42% of salary) |
| Total | $2,666.05 |

Thus, the total current salary differential between the Cyclorama Director's position and plaintiff's current position is $1,366.05 per month.

72. Plaintiff has established that pre-judgment interest upon his back pay ($93,075.66 less interim earnings of $22,450.00 for a net of $70,625.66) is $18,903.01.

73. The parties have agreed that, had plaintiff been employed as Cyclorama Director on November 1, 1981, his salary as of March 31, 1985, would be $24,720 per annum based upon the current salary for a position classified in Salary Range 71, Step 4. The parties' agreement reflects adjustments to the "salary range" of the Cyclorama Director's position, as well as annual "step" increases plaintiff would have received on the anniversary of his hire, assuming satisfactory performance. Accordingly, the Court finds that plaintiff's current salary as Cyclorama Director would be $24,720 per annum had he been hired on November 1, 1981.

74. After trial, Carole Mumford, present Director of the Cyclorama, moved to intervene. The Court conducted an evidentiary hearing on her motion, at which she testified, and her motion is denied in a separate, contemporaneous order.

75. There is conflicting evidence as to whether Ms. Mumford knew of the possibility of her replacement as a result of this lawsuit when she accepted her present post. Carolyn Boyd Hatcher, the present Commissioner of Parks, Recreation and Cultural Affairs, testified, at the trial on the merits, that she was "fairly clear" about Ms. Mumford's being advised of the possibility of displacement. Ms. Hatcher testified that she thought Ms. Mumford was "aware of that and that it could be an eventuality." Ms. Mumford, on the other hand, states in an affidavit that she had "no knowledge, notice or information at the time [she] decided to accept the position with the Cyclorama that [her] job would in any way be conditional, contingent or temporary."

76. Ms. Mumford did testify, however, at the hearing on the motion to intervene, that plaintiff had discussed or threatened a lawsuit before she assumed the position as Director. Given that fact, and the fact that this action had come before the Court on plaintiff's motion for preliminary injunction after Mumford had applied for the position on an earlier occasion and before she became Director, the Court finds that she was, at the very least, on inquiry notice about this lawsuit and plaintiff's request for placement in the Director's position.

77. Ms. Mumford attended a conference of defendants and defense counsel before the two-week trial in order to prepare testimony for the trial. She was informed by defense counsel of plaintiff's prayer for relief, but, in light of defense counsel's advice to her that there was little likelihood of her displacement as a result of the case, she failed to intervene. Ms. Mumford was aware of the hearing on instatement but was told by defense counsel that her presence was not necessary.

*Ultimate Findings of Fact and Conclusions of Law*

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 and section 706(f) of Title VII of the

Act of 1972 ("Title VII"), 42 U.S.C. § 2000e–5(f)(3). All conditions precedent to the maintenance of this action under Title VII have been satisfied. Plaintiff is protected by section 703 of Title VII, 42 U.S.C. § 2000e–2(a), which prohibits discrimination against whites as well as blacks. *McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976). Plaintiff is also protected by section 704 of Title VII, 42 U.S.C. § 2000e–3(a), which prohibits an employer from discriminating against an applicant for employment because he has made a charge under Title VII.

2. Plaintiff proved that defendant City of Atlanta, through its officers and agents, intentionally discriminated against him on account of his race. The Court concludes that, but for plaintiff's race, plaintiff would have been hired as Cyclorama Director by November 1, 1981.

3. Discrimination that is illegal under Title VII may be proved by direct or circumstantial evidence. "[W]hen there is direct evidence 'that the defendant acted with a discriminatory motive, and the trier of fact accepts this testimony, the ultimate issue of discrimination is proved.'" *Thompkins v. Morris Brown College,* 752 F.2d 558, 563 (11th Cir.1985) (quoting *Bell v. Birmingham Linen Service,* 715 F.2d 1552, 1557 (11th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 2385, 81 L.Ed.2d 344 (1984)). As the Eleventh Circuit has explained,

> Once an unconstitutional motive is proved to have been a significant or substantial factor in an employment decision, defendant can rebut only by proving by a preponderance of the evidence that the same decision would have been reached even absent the presence of that factor.

*Lee v. Russell County Board of Education,* 684 F.2d 769, 774 (11th Cir.1982). When substantial direct evidence of discrimination, sufficient to establish that discrimination was a significant factor in an employment decision, has been shown, the allocation of proof prescribed in *McDonnell*

*Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and explained in *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), does not apply. *Simmons v. Camden County Board of Education,* 757 F.2d 1187, 1189 (11th Cir.1985) (per curiam).

Plaintiff presented credible, substantial direct evidence of discrimination that was a significant factor in the decisions not to employ him. First, plaintiff proved that Commissioner Elder allowed the September 1981 register of qualified applicants to expire after she asked the interview panel about the race of the persons on the register. Second, Elder's motives were manifest in the December 21, 1981 memorandum to Commissioner Axam that discussed the lack of minority group representation on the September 1981 register. The attention to the number of minority persons on the *qualified register,* instead of the number of *applications* from such persons, is particularly telling; since over forty percent of the applicants were black, there was no evident lack of opportunity that needed redress. Third, plaintiff had been rated well qualified by the Personnel Department, was selected as among the three best candidates by the interview panel, and was considered the best qualified applicant by the only voting panel member who testified in Court as to his preference. There is no evidence that the interview panel saw the best applicants as falling short of the desired qualifications. Fourth, Commissioner Elder's professed reason for failing to hire anyone from the register does not outweigh her obvious concern with race, because plaintiff was again rated well qualified later when the job description was modified to address her professed concerns about marketing.

4. Where a plaintiff adduces circumstantial evidence of discrimination, the allocation of proof as set forth in *McDonnell Douglas* and *Burdine* applies:

> First, the plaintiff has the burden of proving by the preponderance of the evi-

dence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

... The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.

*Burdine*, 450 U.S. at 252–53, 101 S.Ct. at 1093 (quoting *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825) (citation omitted). Plaintiff has presented credible circumstantial evidence.

 5. Plaintiff established a prima facie case of racial discrimination by showing that he is white; that he was well qualified for the job in question; that, despite his qualifications, he was not hired; and that defendant City of Atlanta later hired a person of another race. *See McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Carmichael v. Birmingham Saw Works*, 738 F.2d 1126, 1130–31 (11th Cir.1984). Defendant City of Atlanta's asserted reason for plaintiff's nonselection in the fall of 1981, namely a shift in focus for the Cyclorama Director position and a concern for the qualifications of the top three candidates, was a pretext for discrimination. The Court concludes that, had plaintiff been black, he would have been hired on November 1, 1981, some two weeks after plaintiff's October 13, 1981, interview with Commissioner Elder. It is reasonable to conclude that, but for the discrimination, plaintiff would have been in place as Cyclorama Director by November 1, 1981.

 The jury found that defendant Geraldine Elder was liable for racial discrimination against plaintiff in the decision to allow the 1981 register to expire. The jury

did not, however, in its advisory capacity find the City liable under Title VII for that decision. On that point alone the Court's decision on the Title VII claims differs from the advisory decision of the jury. The Court finds that the City bears responsibility for Elder's action because she was an officer whose acts were fairly chargeable to the City itself. In all other respects the Court adopts the advisory decision of the jury on the Title VII claims.

The Court also concludes that the City engaged in further acts of racial discrimination in the selections of Ms. Pinkney as provisional Director in March 1982 and of Mr. Palmer as Director of the Cyclorama in March 1983. Both appointees were less qualified than plaintiff, and the City's reasons for hiring them were a pretext for racial discrimination.

 On the other hand, plaintiff did not prove a case of gender-based discrimination. One of the three best candidates on the first register was a white woman; she, too, failed to be appointed. Later, in March 1983, a black man was appointed Director. The appointment of a black woman, Carol Pinkney, as provisional Director was an instance of racial, not gender-based, discrimination.

 6. In order to prove retaliation, a

plaintiff must establish (1) that there was a statutorily protected participation, (2) that an adverse employment action occurred, and (3) that there was a causal link between the participation and the adverse employment action.

*Whatley v. Metropolitan Atlanta Rapid Transit Authority*, 632 F.2d 1325, 1328 (5th Cir.1980). In this case, plaintiff established that he engaged in protected participation by filing his EEOC charges and this lawsuit; that his application was passed over in October 1982, again in March 1983 when Mr. Palmer was hired, and again in November 1983 when Carole Mumford and Pam Apple were appointed Director and Associate Director; and that those adverse

actions occurred in retaliation for his charges of discrimination and this lawsuit.

7. Plaintiff is presumptively entitled to back pay, including fringe benefits. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 417–423, 95 S.Ct. 2362, 2371–74, 45 L.Ed.2d 280 (1975). Plaintiff proved that his earnings with the City would have been $93,075.66 and that he actually earned $22,450.00. Defendant City of Atlanta is entitled to an offset for plaintiff's interim earnings.

8. Defendant City of Atlanta claims that plaintiff acted unreasonably in failing to mitigate damages. The burden of establishing plaintiff's lack of diligence is upon the City. *Nord v. United States Steel Corp.*, 758 F.2d 1462, 1470–71 (11th Cir.1985). The Court finds that defendant City of Atlanta failed to prove any lack of diligence on plaintiff's part. The City's evidence of other, lower-paying City positions for which plaintiff was qualified is not enough to meet the City's burden to show a lack of due diligence. Even assuming that plaintiff might have been offered one of the lower-paying positions, he was under no duty to accept a job not substantially equivalent to the one he was denied. *See Ford Motor Co. v. EEOC*, 458 U.S. 219, 231–32, 102 S.Ct. 3057, 3065–66, 73 L.Ed.2d 721 (1982). As discussed above in the findings, plaintiff satisfied the Court that he was reasonably unable to earn more than he did.

9. Plaintiff is entitled to back pay of $70,625.66.

10. Plaintiff is also entitled, under Title VII, to an award of prejudgment interest on his back pay in an amount computed in accordance with the adjusted prime rate established by the Internal Revenue Service in accordance with 26 U.S.C. §§ 6621 and 6622. *EEOC v. Wooster Brush Co. Employees Relief Association*, 727 F.2d 566, 578–579 (6th Cir.1984), *aff'g in part* 523 F.Supp. 1256 (N.D.Ohio 1981) (award at adjusted prime); *EEOC v. Pacific Press Publishing Association*, 482 F.Supp. 1291, 1319–1320 (N.D.Ca.1979),

*aff'd*, 676 F.2d 1272 (9th Cir.1982); *Association Against Discrimination in Employment v. Bridgeport*, 572 F.Supp. 494 (D.Conn.1983); *see EEOC v. County of Erie*, 751 F.2d 79 (2nd Cir.1984) (FLSA and Equal Pay Act case).

11. The interest is calculated from the end of each calendar quarter, on the amount then due and owing. *Fadhl v. Police Department of the City and County of San Francisco*, 553 F.Supp. 38 (N.D. Cal.1982); *see Florida Steel Corp.*, 96 L.R. R.M. 1070, 1072 (1977) (NLRB rule: "we shall require that backpay be computed utilizing the Woolworth formula [F.W. Woolworth Co., 26 L.R.R.M. 1185 (1950)], with interest to accrue commencing with the last day of each calendar quarter of the backpay period on the total amount then due and owing at the 'adjusted prime rate' then in effect and continuing at such rate, as modified from time to time by the Secretary of the Treasury)." The Eleventh Circuit, in considering the question of when back pay accrues under Title VII, has adopted the NLRB quarterly earnings formula. *Darnell v. City of Jasper*, 730 F.2d 653, 656–657 (11th Cir.1984). Since the Eleventh Circuit has concluded that back pay itself accrues on a quarterly basis, then the award of prejudgment interest on the back pay amount should also.

12. The amount of prejudgment back pay interest to be awarded is $18,903.01.

13. Title VII provides plaintiff an action for *equitable* relief, not for damages. Although the Court has discretion to award front pay instead of placement in a job,

> [i]t is the duty of a district court, after a finding of discrimination, to place the injured party in the position he or she would have been absent the discriminatory actions.

*Nord v. United States Steel Corp.*, 758 F.2d 1462, 1470–71 (11th Cir.1985). *See also Darnell*, 730 F.2d at 656.

In light of the circumstances of this case, and after a careful weighing of the equities of all parties involved, the

Court concludes that plaintiff is entitled to be placed in the position of Cyclorama Director. The position is unique in the Atlanta metropolitan area: with the exception of art museums, no facility remotely comparable to the Cyclorama exists. Furthermore, plaintiff's qualifications are uniquely suited to the position of Cyclorama Director.

Defendant City of Atlanta was on notice, by virtue of the evidence presented at the preliminary injunction hearing, of the strength of plaintiff's claims. The Court advised defendant at the conclusion of the hearing, when the Cyclorama Director position was vacant, that it considered plaintiff to have a "legitimate complaint"; in the order denying the preliminary injunction the Court found that plaintiff had established a likelihood of prevailing on the merits. Thus, the Court finds that the City knew or should have known that placement of plaintiff as Director, included in plaintiff's prayer for relief, could be ordered by this Court.

The Court has taken into consideration the good performance of Ms. Mumford as Cyclorama Director and her explanation of the choice she made in taking the post. Had she elected to participate in the trial, and had she testified at trial to the same effect as at the hearing on the motion to intervene, the Court nevertheless would have reached the same conclusion, for reasons expressed more fully in the order on her motion to intervene at pages 5–6, and incorporated hereby.

14. Plaintiff's beginning pay shall be $24,720, the amount plaintiff would be earning had he been hired as Cyclorama Director on November 1, 1981. Defendant City of Atlanta shall credit plaintiff for all leave (both annual and sick) plaintiff would have earned since November 1, 1981, if he had been continuously employed with the City as Cyclorama Director since November 1, 1981. Defendant City of Atlanta shall also credit plaintiff with any other fringe benefits he would have earned as a City employee. Furthermore, if there is a change in the circumstances in the status of either plaintiff or the City before plaintiff's actual assumption of office, either party may petition the Court to modify the amount of front pay based upon the changed circumstances.

15. Defendant City of Atlanta shall pay plaintiff front pay beginning on April 1, 1985 (the back pay period ended on March 31, 1985) until the date plaintiff is actually employed as Director. The amount of such front pay shall be $1,366.05 per month until plaintiff is actually placed on the job. Plaintiff shall be paid twice per month or, if the City routinely pays its employees more frequently, then it shall pay plaintiff with the same frequency that it pays its other employees. Either party may petition the Court to modify the amount of front pay in light of changed circumstances.

16. In light of the agreement of the parties that interest shall run upon the verdict from April 5, 1985, the Clerk is directed, upon the entry of judgment in this case, to compute post-judgment interest as if a judgment were entered on April 5, 1985.

17. Plaintiff, as prevailing party in this action, is entitled to an award of attorney's fees. In accordance with Local Rule 270–1, plaintiff shall file his motion for attorney's fees not later than ten days prior to the expiration of the time within which the opposing party can file a timely notice of appeal from the judgment finally entered in this case. Within 30 days after filing that motion, plaintiff shall file and serve a detailed specification and itemization of the requested award, with appropriate affidavits and other supporting documentation. However, since defendants have already stipulated that $85 per hour is not an unreasonable base hourly rate, plaintiff is not required to present additional evidence on the reasonableness of an award at $85 per hour.

In light of the findings and conclusions set forth above, the Court FINDS:

(1) that plaintiff has prevailed on his Title VII claims of race discrimination and retaliation against defendant City of Atlanta;

(2) that plaintiff is entitled to be placed no later than June 3, 1985 in the position of Cyclorama Director by the City of Atlanta at a current yearly salary of $24,720;

(3) that plaintiff is entitled to receive from the City back pay of $70,625.66 through March 31, 1985;[1]

(4) that plaintiff is entitled to receive from the City prejudgment interest upon the back pay in the amount of $18,903.01;

(5) that plaintiff is entitled to receive from the City front pay in the amount of $1366.05 per month from April 1, 1985 until plaintiff assumes the post of Director of the Cyclorama;

(6) that plaintiff is entitled to receive from the City interest upon the amounts specified in paragraphs (3) through (5) at the applicable post-judgment interest rate dating from April 5, 1985, until judgment is satisfied; and

(7) that plaintiff is entitled to recover from the City his costs and attorney's fees in an amount to be determined by the Court in accordance with Local Court Rule 270–1.

---

1. The City is jointly and severally liable with defendant Geraldine Elder for $9500 of this sum by virtue of the jury's verdict in that amount against Elder for back pay on plaintiff's section 1981 claim. The damages other than back pay awarded by the jury on plaintiff's section 1981 claims are unaffected by these findings and will be incorporated in the final judgment.