Dennis A. WALTERS, Jr., Plaintiff-Appellee, Cross-Appellant,

v.

CITY OF ATLANTA, et al., Defendants-Appellants, Cross-Appellee.

Dennis A. WALTERS, Jr., Plaintiff-Appellee,

v.

CITY OF ATLANTA, et al., Defendants,

Carole L. Mumford, Movant-Appellant.

Dennis A. WALTERS, Jr., Plaintiff-Appellee,

v.

CITY OF ATLANTA, et al., Defendants-Appellants.

Nos. 85–8426, 85–8427 and 85–8753.

United States Court of Appeals, Eleventh Circuit.

Nov. 10, 1986.

R. Lawrence Ashe, Jr., Gavin S. Appleby, Atlanta, Ga., for Mumford.

Kendric E. Smith, Atlanta, Ga., for City of Atlanta.

Dana E. McDonald, Atlanta, Ga., for Walters.

Before KRAVITCH and HATCHETT, Circuit Judges, and TUTTLE, Senior Circuit Judge.

CORRECTED OPINION

KRAVITCH, Circuit Judge:

## I. BACKGROUND

One of the fiercely fought battles of the Civil War occurred in July 1864 when Union troops captured Atlanta and subsequently laid torch to the city. This engagement is known as the Battle of Atlanta.

In 1885, nine German artists in Milwaukee, Wisconsin began a dioramic painting to commemorate the Battle of Atlanta. The result was the Atlanta Cyclorama, a painting that is 50 feet high and 350 feet in circumference. The painting is now owned by the City of Atlanta and is on display in Grant Park.

In 1949, plaintiff-appellee Dennis Walters, then age six, visited the Cyclorama with his great-aunt. Apparently he was so impressed with the picture that he immediately formed a desire to work at the Cyclorama when he grew up. He pursued this goal into adulthood.

By the 1970's, the painting had greatly deteriorated. Interest in the Battle of Atlanta, however, had not deteriorated and the City of Atlanta expended a large sum of money to restore the painting and refurbish the building housing it. The facility was closed several years for the work and had no staff. In 1981, the City began to look for a director, and Walters sought the position but was not hired. Walters contends that the City of Atlanta and various City officials discriminated against him on the basis of his race in refusing to name him Director of the Cyclorama. In an action against the City and its officials,[1] Walters asserted claims under 42 U.S.C. §§ 1981 & 1983 and under Title VII of the Civil Rights Act of 1964. The section 1981 and 1983 claims were tried to a jury[2] and the district court employed the jury in an advisory capacity in the Title VII suit. The jury found for Walters and, in response to specific interrogatories, found that the defendants discriminated against Walters on four separate occasions between 1981 and 1983.

The district court ordered Walters instated to the position of Cyclorama Director and awarded him back pay, punitive damages and attorney's fees. In No. 85–8426 the City appeals the finding of liability, the equitable relief and the amount of damages. Walters cross appeals the directed verdicts for defendants on his section 1983 claim and his punitive damages claim against the City. In No. 85–8753, the City appeals the award of attorney's fees. In No. 85–8427 Carole Mumford, who was "bumped" from the position of Cyclorama Director by the district court, appeals the district court's denial of her petition to intervene.

## II. FINDINGS OF FACT

The district court entered exhaustive findings of fact. *Walters v. City of Atlan-*

ta, 610 F.Supp. 715 (N.D.Ga.1985). The court found five instances of discrimination against Walters.

### A. *Failure to Hire Anyone in October 1981.*

Pursuant to City regulations, on September 22, 1981, the City established a register for the position of Cyclorama Director. The register is a list of eligible applicants culled by the City's personnel department from those who express an interest in filling an advertised position. Persons on the register are ranked as "highly qualified," "well qualified," or "qualified." Under the City's hiring system, a panel interviews applicants on the register and makes recommendations to department heads. The relevant department head in this case was the Commissioner of Parks, Recreation and Cultural Affairs. Until April 1983, that Commissioner was Geraldine Elder.

The City described the job qualifications, in part, as follows:

*Knowledge, Skills, and Abilities:* Thorough knowledge of the history of Atlanta and the surrounding area, including the Civil War battles. Good knowledge of the theory, practices, and techniques of historic preservation. Some knowledge of general business practices and of keeping financial records. Some knowledge of the field of public relations. Ability to prepare exhibits and plan programs for the general public; ability to speak and write clearly and concisely; ability to establish and maintain effective working relationships with others. Ability to learn and keep abreast of State and Federal regulations regarding the operation of public buildings.

Walters presented evidence that he met these qualifications. He had followed appropriate courses of study while in college, had worked in historical preservation at the Georgia Historical Commission and had

---

1. In addition to the City of Atlanta, Walters sued, in their individual and official capacities, Mayor Andrew Young; Chief Administrative Officer, Shirley Franklin; and Commissioners Clara Axam and Geraldine Elder.

2. The jury did not consider Walters' § 1983 claim; the trial court granted defendants' motion for directed verdict on that claim prior to instructing the jury.

worked as a conservator at the North Carolina Museum of History. Seven applicants were listed on the register for Cyclorama Director. All seven were white. Walters was among the seven and was rated "well qualified." The interview panel recommended three applicants, including Walters. Commissioner Elder interviewed all three, but decided not to fill the position. She then asked the interview panel about the race of the four other persons on the register.

On December 21, 1981, Elder requested a new register, and stated her reasons in a memorandum to the Personnel Commission:

1. The current register, dated 9–22–81, does not include any minority group representation. A new register would help remedy this situation.

2. The top three (3) candidates recommended to me by the interview panel, Jody Cook, Robert Jones, and Dennis Walters, although qualified, I am concerned about the extent of their expertise in business administration and management which is critical to the Cyclorama becoming a self-sufficient tourist attraction.

If the goal of self-sufficiency is to be accomplished, clearly a background in history, museum studies, art, or even the Civil War battles themselves becomes secondary to expertise in business management and finance.

On March 30, 1982, the appellants appointed Carole J. Pinkney, a black woman, to the Director position on a provisional basis. Pinkney was not hired from a register. Immediately prior to the appointment, Pinkney had been an administrative assistant in Mayor Young's office. She had also worked for the Mayor's campaign, a job she took after being fired from a position with the YWCA. At the same time, the City made a provisional appointment of Mary L. Vance as associate director. Vance also was not hired from a register. Pinkney's performance was not satisfactory and she was relieved on November 4, 1982. The position remained vacant until March 1983.

B. *Hiring of David Palmer*

The position was reannounced on July 22, 1982 and a new register was established on September 12, 1982. Walters again applied and again was rated "well qualified." David Palmer, a black male, also applied for the position. Palmer had initially been rated as "unqualified," however, he appealed this determination and was rerated as "qualified" on the basis of two years experience marketing food products.[3] A panel interviewed the thirteen applicants on the register and recommended three candidates to Elder, including Walters. Palmer was not among the top three candidates. On October 25, 1982, Elder once more decided to "hold" the appointment. In December, the interview panel conducted another round of interviews. Palmer was interviewed on December 2, 1982. One week before, Palmer had been terminated from a position with the Georgia Department of Labor amid allegations of misconduct. In July of 1981, he had been dismissed from a position as City Water Service Administrator for poor performance. Shortly afterwards the City learned that he had held this position simultaneously with his job with the Department of Labor. Palmer was appointed Cyclorama Director in March 1983. In May 1983 Palmer was reinstated to his position with the State's Department of Labor. He held that full-time job, in contravention of city regulations, while serving as the Cyclorama Director. As a result of Palmer's inadequate job performance, he was fired on June 29, 1983 by the new Commissioner of Parks, Recreation and Cultural Affairs, Carolyn Boyd Hatcher.

**3.** Palmer was initially ranked as "unqualified." Plaintiff's exhibit 24. On September 20, 1982, he appealed and on September 27, was reevaluated as "qualified." Plaintiff's exhibit 25. He was listed as "well qualified" on the September 17, 1982 register, Plaintiff's exhibit 14, although other City employment records list him only as "qualified" for the position. Defendant's exhibit 73.

### C. *Hiring of Carole Mumford*

After Palmer's dismissal, Walters again applied and interviewed for the position. The City, however, hired Carole Mumford, a white female, to be Director and Pam Apple, a white female, as Associate Director on November 18, 1983. Ms. Mumford had been rated as "qualified" in the same 1982 register that listed Walters as "well qualified" for the Director position.

### III. PRIOR PROCEEDINGS

Walters filed an initial charge of discrimination with the Equal Employment Opportunity Commission (EEOC) on May 20, 1982. The EEOC determined that Walters' charges were well founded: he was "more qualified" than the two provisionally appointed females and was not hired because, as the City admitted, there were no minorities on the City's register "although the position had been properly advertised and processed." See *Walters*, 610 F.Supp. at 721 (quoting EEOC determination). Accordingly, Walters received a "right to sue letter" from the Department of Justice on April 23, 1983 and timely filed suit in the district court on July 11, 1983.

On July 18, 1983, Walters filed a second discrimination charge with the EEOC. This claim stemmed from the March 1983 hiring of Palmer even though at that time Walters was, according to the City's register, more qualified. Walters amended this second charge in January 1984 to further challenge the appointments of Mumford and Apple. In March of 1984, the EEOC determined that there was reasonable cause to believe that the City had discriminated against Walters on account of his race and in retaliation for filing his first discrimination charge in 1982. Walters received a second right to sue letter in April 1984 and promptly amended his complaint in district court.

### IV. ANALYSIS

A. *The findings of the district court with respect to illegal discrimination are not clearly erroneous*

■ The district court found that Walters presented a prima facie case of race

discrimination through direct evidence. With respect to the City's failure to hire Walters off the September 1981 register, the court found that:

> Plaintiff presented credible, substantial direct evidence of discrimination that was a significant factor in the decisions not to employ him. First, plaintiff proved that Commissioner Elder allowed the September 1981 register of qualified applicants to expire after she asked the interview panel about the race of the persons on the register. Second, Elder's motives were manifest in the December 21, 1981 memorandum to Commissioner Axam that discussed the lack of minority group representation on the September 1981 register. The attention to the number of minority persons on the *qualified register*, instead of the number of *applications* from such persons, is particularly telling; since over forty percent of the applicants were black, there was no evident lack of opportunity that needed redress.

610 F.Supp. at 726. The district court correctly found that Elder's statements were direct evidence of racial discrimination. *See Thompkins v. Morris Brown College*, 752 F.2d 558, 563 & n. 11 (11th Cir.1985); *Bell v. Birmingham Linen Service*, 715 F.2d 1552, 1553–56 (11th Cir.1983), *cert. denied*, 467 U.S. 1204, 104 S.Ct. 2385, 81 L.Ed.2d 344 (1984); *Lee v. Russell County Board of Education*, 684 F.2d 769, 771–74 (11th Cir.1982).

■ The district court correctly accepted the direct evidence of racial discrimination as proof of discrimination. *See Thompkins*, 752 F.2d at 563; *Bell*, 715 F.2d at 1557. Thereupon, the City bore a heavy burden:

> [o]nce an unconstitutional motive is proved to have been a significant or substantial factor in an employment decision, defendant can rebut only by proving by a preponderance of the evidence that the same decision would have been reached even absent the presence of that

factor. *Mt. Healthy City School District v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). *See, e.g., Avery v. Homewood City Board of Education,* 674 F.2d 337 (5th Cir.1982, Unit B) [, *cert. denied,* 461 U.S. 943, 103 S.Ct. 2119, 77 L.Ed.2d 1300 (1983) ].

*Lee,* 684 F.2d at 774 (footnote omitted); *see also Bell,* 715 F.2d at 1557. The appellants contend that they met this burden through testimony that the City rethought the necessary qualifications for the position after obtaining the first register and changing the emphasis from historical experience to marketing and management. Appellants argue that the reevaluation of the position was made in part out of deference to the incoming administration of Mayor Young, which had an announced goal of increasing revenues from city facilities such as the Cyclorama. The district court specifically found that this reason was pretextual. 610 F.Supp. at 727. Accordingly, the City could not meet the heavy burden set forth above. Appellants contend that this finding is clearly erroneous because Elder listed the reevaluation of the position in her letter and because they presented evidence that the incoming administration genuinely wanted to increase revenues at City facilities. We disagree. The evidence demonstrated that Commissioner Elder articulated the "reevaluation" rationale only after inquiring about the race of the candidates on the register and learning that all were white. The circumstances, therefore, support the district court's finding of pretext. In essence, the district court did not credit Elder's testimony and we cannot set aside the credibility choices the district court made. *See Anderson v. City of Bessemer City,* 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).[4] Therefore, the district court's ruling that, absent illegal discrimination, Walters would have been appointed Director on November 1, 1981, is supported by the evidence and must be affirmed.[5]

■ The district court also found that the City discriminated against appellant in the selection of Pinkney as provisional Director in March 1982 and Palmer as Director in March 1983. Once the plaintiff

---

**4.** Although defendants' testimony plausibly suggested that Walters was denied employment because the qualifications for the directorship had changed, the district court explicitly rejected this explanation and chose to credit the direct evidence showing that Walters was a victim of racial discrimination. In addition to Commissioner Elder's December 21, 1981 memorandum, Walters testified that during an EEOC conference in August 1982, Elder admitted that Walters had not been hired because there were no minorities represented on the September 1981 register. We also note that under the 1982 revised description emphasizing business acumen as well as historical knowledge, Walters was rated "well qualified" whereas Mumford had been rated "qualified." In sum, the district court weighed contradictory evidence and credited Walters' interpretation.

In *Anderson,* the United States Supreme Court recently reiterated that an appellate court may not set aside findings of fact unless a review of the entire record leaves the appellate court with a definite and firm conviction that a mistake has been made. 105 S.Ct. at 1511 (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948) ). Our review of the extensive record and the trial court's detailed findings convince us that the district court has not erred. The trial court made a credibility choice between witnesses and when a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error. *Anderson,* 105 S.Ct. at 1513 (citations omitted). We note that this case more than satisfies the *Anderson* guidelines: defendants' plausible story was contradicted by the extrinsic evidence of Elder's December 1981 memorandum.

**5.** Appellants also contend that the district court erred in denying their motion for a directed verdict on Walters' § 1981 claims. Appellants base their contention on the same arguments supporting their assertion that the district court erroneously found discriminatory intent in assessing Walters' Title VII claim. Because we conclude that the district court correctly resolved Walters' Title VII claim, we necessarily conclude that there was a sufficient controversy to allow the jury to consider Walters' § 1981 claim. *See Whiting v. Jackson State Univ.,* 616 F.2d 116, 121 (5th Cir.1980) (When § 1981 is used as a basis for relief parallel to that provided by Title VII, the elements of a § 1981 claim are identical to the elements of a Title VII claim.).

showed illegal discrimination in October 1981, subsequent incidents of discrimination were not necessary to the claim for damages and equitable relief. Nevertheless, we note that the district court's findings of fact regarding these latter acts of discrimination are not clearly erroneous. That the City had a legitimate reason for subsequently selecting over Walters a candidate who twice had been dismissed from public employment is dubious at best.[6]

The district court found that the City's appointment of Mumford over Walters was in retaliation for Walters' pursuit of his Title VII claims. In order to prove retaliation,

> plaintiff must establish (1) that there was a statutorily protected participation, (2) that an adverse employment action occurred, and (3) that there was a causal link between the participation and the adverse employment action.

*Whatley v. Metropolitan Atlanta Rapid Transit Authority*, 632 F.2d 1325, 1328 (5th Cir.1980). The district court determined that the filing of Walters' EEOC claim and this suit was protected conduct; Walters was denied employment after he filed his claims; and there was a causal connection between his protected conduct and the denial of the directorship. The City contends that the findings of retaliation are not justified, but does not provide any argument or authority in support of this position. The district court applied the correct criteria and its findings are not clearly erroneous. Accordingly, we affirm the district court's findings that Walters was denied employment in retaliation for seeking redress of past discrimination against him.

**B.** *Directed Verdict on Walters' Section 1983 Claim*

Walters claims on cross appeal that the district court erred in granting defendants' motion for a directed verdict on his substantive due process claim brought under 42 U.S.C. § 1983. The parties stipulated that City policy favored the appointment of members of Mayor Young's transition team to provisional municipal positions. The Pinkney and Vance appointments to positions at the Cyclorama were made pursuant to this policy. Relying on *Hearn v. City of Gainesville*, 688 F.2d 1328 (11th Cir.1983) (state law may provide an interest in continued municipal employment enforceable in a section 1983 action), Walters asserts that the City Code of Atlanta provides that personnel appointments are to be made without regard to political affiliation. He contends that this created a property interest in obtaining the Cyclorama directorship without regard to his political affiliation. We disagree. The City Code expresses the intent and purpose of the City to appoint personnel without regard to political affiliation. We cannot say that it creates property interests in those seeking municipal employment. *Cf. Perry v. Sindermann*, 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972) (property interest created by rules or mutually explicit understandings that may be invoked in a hearing). The Georgia cases that Walters relies on do indeed create enforceable property rights. *Brownlee v. Williams*, 233 Ga. 548, 212 S.E.2d 359 (1975) (right to post-discharge hearing); *City of Atlanta v. Mahony*, 162 Ga.App. 5, 289 S.E.2d 250 (1982) (right to hearing subsequent to employment termination attributable to abolition of employee's position). State law does not, however, create the property

**6.** Kurt Fanstill, a member of the panel that interviewed Palmer and found him better qualified than Walters, testified that he had not been aware of the full extent of Palmer's past difficulties in city employment and was unaware of Palmer's problems in state employment. Fanstill testified that he had assumed that the personnel department, headed by defendant Axam, would have screened out candidates who had serious problems in past city employment. As noted above, Palmer was initially rated "unqualified," rerated as "qualified," and listed as "well qualified" on the September 17, 1982 register. The "well qualified" listing put him in head to head competition with Walters for the directorship—a competition that Palmer initially lost when the interviewing panel recommended Walters and two other applicants in the fall of 1982. *See* § II B, *supra.*

right Walters asserts.[7] Accordingly, we conclude that the district court correctly entered a directed verdict for defendants on this claim.

## C. *Damages*

### 1. *Back Pay*

Prior to seeking the Cyclorama position, Walters operated an architectural restoration business. Confident that he would be appointed to the Cyclorama directorship, he closed his business after the initial round of interviews. During 1981 and 1982 Walters did not seek employment other than the position of Cyclorama Director. The City contends that Walters' actions were unreasonable and that he should have acted to mitigate his damages. The district court found that

> Plaintiff's explanation for his lack of income for part of 1981 and for all of 1982—that he devoted all that time to obtaining the Director's position and that, because he expected in good faith to receive the appointment, he felt it improper to accept other employment under the pretense that he intended to be a long-term employee—was credible in the circumstances of this case and satisfied the Court. Plaintiff has shown a remarkable degree of patience and endurance in bringing this suit to its conclusion; he has shown far greater persistence in attaining his goal than other plaintiffs who have come before this Court.

610 F.Supp. at 724–25.

■ In awarding damages in a Title VII case, the district court must seek to place the injured party in the position he or she would have been in absent the discriminatory actions. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *Nord v. United States Steel Corp.*, 758 F.2d 1462, 1470 (11th Cir. 1985). A Title VII plaintiff is required, however, to mitigate damages by being reasonably diligent in seeking employment

substantially equivalent to the position he lost. 42 U.S.C. § 2000e–5(g); *Ford Motor Co. v. Equal Employment Opportunity Commission*, 458 U.S. 219, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982); *Nord*, 758 F.2d at 1470 (11th Cir.1985). The district court's findings of fact concerning whether a Title VII defendant has shown plaintiff's lack of diligence will not be disturbed unless clearly erroneous. *Nord*, 758 F.2d at 1470.

■ In this case the district court did not find that Walters had been diligent; rather the district court ruled that his lack of diligence was excused by his exclusive employment goal of obtaining the Cyclorama directorship and by his tenacious pursuit of the position through legal recourse. We do not doubt the genuineness of Mr. Walters' desire to work at Cyclorama; nevertheless it is not a substitute for diligently seeking alternative employment. *Cf. Miller v. Marsh*, 766 F.2d 490, 492 (11th Cir.1985) (plaintiff who stopped seeking employment to enroll in law school had failed to mitigate her damages). In *Miller*, this court stated that the plaintiff's duty is "not fulfilled by a readiness to accept only the job sought with the defendant. The plaintiff must be available and willing to accept substantially equivalent employment elsewhere."

766 F.2d at 492.

■ Walters was not initially required to seek employment in another field. *See, Ford Motor Co., supra.* Having decided, however, that no other job in his field would suit him, he became obligated to seek employment in another field. *Cf. Hayes v. Shelby Memorial Hospital*, 546 F.Supp. 259, 266 (N.D.Ala.1982) (although Title VII plaintiff need not be successful in mitigating damages, plaintiff must make a reasonable, good faith effort to mitigate), aff'd, 726 F.2d 1543, 1554 (11th Cir.1984). In September of 1983, Walters took a position at Fulton Hardware Store and earned $1200 a month. Walters testified that he had initially been offered the position in mid–1982. The City does not dispute that

---

7. Although we affirm the district court's order instating Walters as the Cyclorama Director, our

affirmance is not based on a pre-employment property right to that position.

this position met Walters' duty to mitigate. Accordingly, we hold that the award of back pay should be reduced by the amount Walters could have earned had he accepted the Fulton Hardware Store position when first offered.

### 2. *Mental Anguish*

The jury awarded Walters $150,000 for mental distress. Appellants contend that there was insufficient evidence that Walters suffered compensable injury in this regard. The sufficiency of the evidence may not be challenged on appeal unless it was raised in a motion for directed verdict which specifically stated the ground raised on appeal. *Brookhaven Landscape & Grading Co. v. J.F. Barton Contracting Co.,* 676 F.2d 516, 523 (11th Cir.1982). Although the appellants moved for a directed verdict on mental anguish damages, the only ground advanced in support of the motion was lack of intentional infliction of emotional distress. The motion in no way pertained to whether Walters had presented evidence of actual injury.[8] Motions for directed verdict based on the sufficiency of the evidence must state specific grounds. Fed.R.Civ.P. 50(a). Any deficiency in the evidence which is not specifically addressed in the motion for directed verdict may not be raised on appeal. *See House of Koscot Development Corp. v. American Line Cosmetics, Inc.,* 468 F.2d 64, 67–68 & n. 4 (5th Cir.1972); 9 C. Wright & A. Miller, Federal Practice & Procedure § 2533 (1971 & 1986 supp.). A party cannot have a jury consider the merits of a case while tacitly holding an insufficient evidence claim in reserve for an appeal. To preserve such a claim for appeal, a party must squarely present it to the trial court and afford that court the initial opportunity to consider the claim's merits. A party may not pretermit the trial court's assessment by waiting for an appeal to address the specifics of a claim. Accordingly, we do not consider the sufficiency of the evidence as to Walters' mental anguish on this appeal.

Instead we review the award for plain error; *i.e.*—error so apparent on the face of the record that allowing the award to stand would result in a manifest miscarriage of justice. *Coker v. Amoco Oil Co.,* 709 F.2d 1433, 1437 (11th Cir.1983). We conclude that the award here is not manifestly unjust. Walters repeatedly interviewed for a job for which he was well qualified and was repeatedly denied that job because of his race. He testified as to his lifelong desire to work at the Cyclorama and the frustration and emotional "wear and tear" surrounding his repeated attempts to obtain employment at the facility. Walters also brought out, through the cross examination of Mayor Young, testimony regarding the extreme frustration experienced by victims of discrimination. In *Stallworth v. Shuler,* 777 F.2d 1431 (11th Cir.1985), we held that a trial court had not erred by awarding compensatory damages of $100,000 to a plaintiff who, though qualified, had been repeatedly passed over for promotions because of his race. *Id.* at 1435. Accordingly, in the instant case we conclude that there is ample evidence demonstrating that the award for mental anguish was not plain error.

### 3. *Punitive Damages*

The jury awarded Walters a total of $7,000 in punitive damages on his section

---

**8.** A plaintiff in the damages phase of an employment discrimination suit need not make out the elements of the tort of intentional infliction of emotional distress in order to recover compensation for mental anguish. All a plaintiff need do is present evidence from which a jury could determine that the plaintiff has suffered mental anguish. *See Carey v. Piphus,* 435 U.S. 247, 266, 98 S.Ct. 1042, 1053, 55 L.Ed.2d 252 (1978); *Busche v. Burkee,* 649 F.2d 509, 519 n. 13 (7th Cir.), *cert. denied,* 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981).

Were we to address the sufficiency of the evidence supporting Walters' award for mental anguish, we would determine that the measure of these damages was properly presented to and decided by the jury for the same reasons that lead us to conclude that the award is not manifestly unjust. *See Whitley v. Seibel,* 676 F.2d 245, 252 (7th Cir.1982) (assuming charge was correct, appellate review of award for mental anguish may second guess jury determination only if review of record establishes "definite and firm conviction that a mistake has been committed").

1981 claim: $2,000 from Elder, $2,000 from Mayor Young, $2,000 from Franklin, and $1,000 from Axam. Appellants contend that these awards were improper because there was no evidence that the defendants violated Walters' rights in an intentional or reckless manner. *See Smith v. Wade,* 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983); *H.C. v. Jarrard,* 786 F.2d 1080, 1089 (11th Cir.1986) (defendant's conduct constituted callous indifference to federally guaranteed rights and warranted punitive damages award). Specifically, appellants contend that the court erred in denying their motion for a directed verdict on punitive damages.

■ The evidence established that Walters repeatedly had been denied employment on the basis of his race. Through special interrogatories, the jury found that, at some point, all defendants were responsible for the racial discrimination Walters suffered.[9] Nonetheless, we conclude that the jury improperly awarded punitive damages against defendants Young, Franklin and Axam. Punitive damages are disfavored by the law and are awarded solely to punish defendants and deter future wrongdoing. Although Walters was the victim of repeated discriminatory acts, the record does not support a conclusion that defendants Young, Franklin and Axam acted with either the requisite ill will or callous disregard of Walters' federally guaranteed rights.

Walters testified that all defendants had treated him courteously throughout his endeavors to obtain the Cyclorama directorship. Courteous behavior may mask a cynical disregard of federal rights; such, however, is not the case here. Walters demonstrated only that Young and Franklin were aware of difficulties regarding the search for a Cyclorama director and had responded to his letters by assuring him that he would receive "the fullest consideration" when the time came to fill the directorship.[10] Similarly, the evidence established only that Axam was in charge of the city's personnel department which had processed Walters' applications and that she had responded to Walters' inquiries regarding the directorship. Thus nothing in the record suggests that these defendants took action against Walters that was motivated by ill will or a reckless disregard for Walters' federally guaranteed rights. *See Dillon v. Coles,* 746 F.2d 998, 1002 n. 4 (3d Cir.1984). Accordingly, we vacate the award of punitive damages against these defendants.

■ The punitive damages award against Elder rests on more substantial evidence. It was Elder's decision not to hire Walters when he was initially recommended for the Cyclorama directorship. Even though the register from which Walters was recommended properly reflected minority applicants, Elder did not hire Walters because there were no minority mem-

9. The jury found that the acts listed below were instances of racial discrimination directed at Walters and assessed responsibility as follows:
  i. Commissioner Elder's decision not to hire anyone as the Cyclorama Director in fall 1981:
    Geraldine Elder.
  ii. Selection of Carol Pinkney to serve as provisional director of the Cyclorama:
    City of Atlanta
    Andrew J. Young
    Shirley C. Franklin
    Geraldine Elder.
  iii. Elder's decision not to fill the Cyclorama Director position on October 25, 1982:
    City of Atlanta
    Andrew J. Young
    Shirley C. Franklin
    Geraldine Elder.
  iv. Hiring of David Palmer as Cyclorama Director on March 17, 1983:

    City of Atlanta
    Andrew J. Young
    Shirley C. Franklin
    Clara H. Axam
    Geraldine Elder.
The jury also determined that all defendants were responsible for the hiring of Palmer which discriminated against Walters in retaliation for his filing a claim with the EEOC. Similarly, the jury determined that all defendants, except Elder, were responsible for the discriminatory hiring of Carole Mumford and Patricia Apple in November 1983 in retaliation for Walters' filing charges with the EEOC.

10. We do not regard Franklin's recommendation of Pinkney to a provisional appointment as director of the Cyclorama as an act taken in callous disregard of Walters' rights.

bers among the candidates recommended to her. As the district court noted, Elder's professed concerns regarding marketing experience did not "outweigh her obvious concern with race" because Walters was again rated well qualified when the job description was modified to encompass marketing skills. 610 F.Supp. at 726. Moreover, Elder subsequently hired other applicants less qualified than Walters. *Id.* at 727. We conclude that a reasonable jury could determine that Elder declined to hire Walters in reckless disregard of his federally guaranteed rights. *Cf. Stallworth v. Shuler,* 777 F.2d at 1435 (punitive damages award supported by defendant's sham job selection procedure and tailoring of employment criteria in order to hire less qualified applicants). Accordingly, we affirm the award of punitive damages against Elder.

On cross appeal, Walters asserts that the court erred by instructing the jury that it could not award punitive damages on his section 1981 claim against the City of Atlanta. We conclude that the district court was correct. In *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981), the Court held that a municipality could not be liable for punitive damages in a section 1983 action. The *Fact Concerts* Court noted that if Congress had intended to displace well settled common law exempting municipalities from punitive damages liability in 1871, when it enacted what is now section 1983, it would have done so explicitly. 453 U.S. at 259–66, 101 S.Ct. at 2755–59. We surmise that when Congress enacted in 1866, and reenacted in 1870, what is now section 1981, it would have explicitly abrogated municipal immunity from punitive damages awards had it so intended. We do not, however, end our inquiry here because the language and foci of sections 1981 and 1983 are not congruent: section 1981 confers benefits, whereas section 1983 assesses liability. *See*

*Garner v. Giarrusso,* 571 F.2d 1330, 1340 (5th Cir.1978).

The *Fact Concerts* Court did not premise its holding solely on the legislative history of section 1983. It further reasoned that municipal liability for punitive damages awards would punish innocent taxpayers, not actual wrongdoers, and therefore considerations of public policy militated against expanding punitive damages liability to encompass municipalities.[11] Given that the *Fact Concerts* Court's policy analysis applies with equal force to section 1981 actions, we conclude that the district court correctly disposed of Walters' punitive damages claims against the City. *Cf. Heritage Homes v. Seekonk Water District,* 670 F.2d 1 (1st Cir.), *cert. denied,* 457 U.S. 1120, 102 S.Ct. 2934, 73 L.Ed.2d 1333 (1982); *accord, Poolaw v. City of Anadarko,* 738 F.2d 364 (10th Cir.1984), *cert. denied,* 469 U.S. 1108, 105 S.Ct. 784, 83 L.Ed.2d 779 (1985).

### D. *Instatement*

The district court ordered Walters instated to the position of Cyclorama Director. The City contends that this was an abuse of discretion because it resulted in the "bumping" of Carole Mumford from the position. This court recently held that a district court may, in its discretion, require the bumping of an employee if necessary to make a Title VII plaintiff whole. *Brewer v. Muscle Shoals Board of Education,* 790 F.2d 1515 (11th Cir.1986) (court may order "bumping" in order to redress breach of Title VII settlement agreement).

The district court found that when the City hired Mumford, it passed over Walters' application in retaliation for his pursuit of a Title VII claim. 610 F.Supp. 727–28. We have already affirmed that finding. Prior to the hiring of Mumford, the City discriminated against Walters on multiple occasions. Indeed, in 1982 both Walters and Mumford applied for the Cy-

---

11. The Court left open the possibility that punitive damages might be available against a municipality in "an extreme situation where the taxpayers are directly responsible for perpetrat-

ing an outrageous abuse of constitutional rights." 453 U.S. at 267 n. 29, 101 S.Ct. at 2760 n. 29. Such a case is not before us.

clorama directorship and Walters received a higher rating. But for the City's discrimination against Walters in 1982 and in his subsequent applications, the position would not have been available for Mumford to fill.[12] To not allow the "bumping" of a direct beneficiary of repeated discrimination by the direct victim of the same acts of discrimination would penalize the plaintiff who won his suit but lost the race to fill the position he had been unlawfully denied.[13]

■■■■■ "Bumping" is an extraordinary remedy to be used sparingly and only when a careful balancing of the equities indicates that absent "bumping," plaintiff's relief will be unjustly inadequate. A defendant's recalcitrance, as evidenced by repeated discriminatory actions after it is on notice of past illegal discrimination against a plaintiff, militates in favor of granting this extraordinary relief. The City, through its illegal conduct in filling the position long after it was aware of Walters' claims, could not prevent the district court from ordering relief in vindication of the law and the Constitution. *See Lee v. Macon County Board of Education*, 453 F.2d 1104, 1112

(5th Cir.1971). The district court's order is further supported by the uniqueness of the Cyclorama directorship and Walters' singular qualifications for it.

■■■■■ In balancing the equities, the district court must not ignore the effect its order will have on a "bumped" employee and must bear in mind that a poorly crafted remedy may achieve justice for one by working a substantial injustice on another. Mumford indicated, however, that the City had offered her a lateral move within the City civil service if she were "bumped." *Walters v. City of Atlanta*, 610 F.Supp. 730, 732 (N.D.Ga.1985). Mumford took the Cyclorama directorship long after Walters began this litigation. Even assuming that she was completely innocent and ignorant of the City's wrongdoing, she attained the position as a result of repeated discrimination and retaliation against Walters. The relief ordered is necessary to vindicate Walters' rights and was within the district court's equitable powers as contemplated by Congress' enactment of 42 U.S.C. § 2000e–5(g).[14]

12. When, on July 11, 1983, Walters filed this suit seeking instatement, the Cyclorama directorship was vacant. 610 F.Supp. at 724. In denying Walters' preliminary motion to enjoin the City from filling the Cyclorama directorship, the trial court indicated that Walters had established a likelihood of prevailing on the merits and, if he prevailed, the court would make him whole. *Id.* at 729. As was the employer in *Brewer*, the City was on notice that a Title VII plaintiff had a substantial claim to its vacant employment position. Mumford's interest in the Cyclorama directorship is therefore subordinate to the trial court's authority to fashion relief in Walters' suit. *Cf. Spagnuolo v. Whirlpool Corp.*, 717 F.2d 114, 120–22 (4th Cir.1983) (employee hired after judicial pronouncement of discrimination is subject to district court's power to fashion equitable relief for Title VII plaintiff).

13. Our decision should be construed narrowly. We expressly do not decide whether "bumping" is a legitimate means of redressing unlawful discrimination where the "bumped" employee and the instated employee are not the beneficiary and victim of repeated and related discriminatory acts. *See Brewer* ("bumping" beneficiary of settlement agreement breach); *Spagnuolo v. Whirlpool Corp.*, 717 F.2d at 122 (court could order "bumping" if defendant passed over

plaintiff it had been ordered to reinstate to next available comparable position); *cf. Wygant v. Jackson Bd. of Educ.*, —— U.S. ——, 106 S.Ct. 1842, 1851–52, 90 L.Ed.2d 260 (1986) (opinion of Burger, C.J., Powell & Rehnquist, JJ.) (extending preferential protection from layoffs unduly imposes entire burden of achieving racial equality on innocent individuals).

14. Defendants' reliance on *Firefighters Local Union v. Stotts*, 467 U.S. 561, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984) is misplaced. *Stotts* undertook a detailed analysis of the legislative history of section 2000e–5(g) and reiterated that the beneficiary of equitable relief ordered pursuant to Title VII must "actually have been a victim of illegal discrimination." 104 S.Ct. at 2588–90; *but see Local 28 v. E.E.O.C.*, —— U.S. ——, —— —— ——, 106 S.Ct. 3019, 3047–50, 92 L.Ed.2d 344 (1986) (plurality opinion) (*Stotts* does not preclude affirmative action program which may benefit nonvictims). *Stotts*, however, is inapplicable here because Walters was a direct victim, and Mumford a direct beneficiary, of discrimination.

*Stotts* noted in dicta that
[l]ower courts have uniformly held that relief for actual victims does not extend to bumping employees previously occupying jobs. *See, e.g., Patterson v. American Tobacco Co.*, 535

■ In sum, four factors support our conclusion that the district court correctly ordered "bumping" in this case: (1) the defendants' repeated instances of racial discrimination against plaintiff; (2) the defendants' recalcitrance as evidenced by subsequent retaliatory acts of discrimination; (3) the uniqueness of the position wrongfully denied plaintiff; and (4) the defendants' ability to minimize the harm suffered by the "bumped" employee.[15]

### E. *Mumford's Application to Intervene*

The jury verdict regarding defendants' liability was reached on April 3, 1985. The district court held a hearing on Walters' request for instatement on April 4, 1985 and orally announced its decision that day. Mumford filed a motion to intervene on May 17, 1985. Mumford seeks to intervene only as to the propriety of the instatement remedy. The district court denied the request.

Rule 24 sets forth four requirements before an applicant in Mumford's situation has a right to intervene:

(1) The application must be timely;

(2) the applicant must claim an interest relating to the property or transaction which is the subject of the action;

(3) the applicant must be so situated that disposition of the action, as a practical matter, may impede or impair his ability to protect that interest; and

(4) the applicant must demonstrate that his interest is represented inadequately by the existing parties to the suit.

Fed.R.Civ.P. 24(a)(2); *Athens Lumber Co. v. Federal Elections Commission,* 690 F.2d 1364, 1366 (11th Cir.1982).

■ The district court denied the motion to intervene because it "was untimely, because her interests were vigorously and skillfully defended by the City of Atlanta, and because, in light of the Court's findings, as a practical matter her ability to protect her interest was not impaired by her absence." The district court's denial of the motion was not er-

---

F.2d 257, 267 (4th Cir.), *cert. denied,* 429 U.S. 920 [97 S.Ct. 315, 50 L.Ed.2d 286] (1976); *United Papermakers and Paperworkers v. United States,* 416 F.2d 980, 988 (5th Cir.1969), *cert. denied,* 397 U.S. 919 [90 S.Ct. 926, 25 L.Ed.2d 100] (1970).

104 S.Ct. 2588 n. 11. In some limited circumstances, however, appellate courts countenance "bumping." *See Lee v. Macon County Bd. of Educ.,* 453 F.2d at 1112. *Lee* held that a court could order instatement even though it would result in the "bumping" of another employee. The *Lee* court "stated that it could not be prevented from ordering relief in vindication of the law and the Constitution by the fact that the [defendant] had already filled the vacancy in violation of established law." *Brewer,* 790 F.2d at 1522 (discussing *Lee* ); *see also, Spagnuolo v. Whirlpool Corp.,* 717 F.2d at 122 (approving order requiring "bumping" incumbent employee in reinstatement case). *Lee, Spagnuolo* and *Brewer* all indicate that a trial court can, after balancing the equities, order the "bumping" of an incumbent employee in order to properly redress a victim of discrimination. The *Stotts* opinion recognized that trial courts must perform a similarly difficult balancing of equities in determining who, among laid off workers, is entitled to the first available position. 104 S.Ct. at 2588 (citing *Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) ).

**15.** This list is not exhaustive, nor is any one factor controlling. We recognize that there is an inherent tension between the third and fourth factors: both the Title VII plaintiff and the "bumped" employee suffer when denied a unique employment opportunity. Both Walters and Mumford valued highly the opportunity to work at the Cyclorama. Both testified that they had been fascinated by the Cyclorama since childhood. Walters pursued a course of studies and employment designed to enhance his employment opportunities at the Cyclorama. Mumford left a responsible position she had held for fourteen years with the Urban League to assume a probationary appointment to the Cyclorama directorship. There are strong equitable arguments on both sides. We agree with the district court, however; the balance of equities favors Walters. He was repeatedly victimized by the City and absent instatement, his relief would be unjustly inadequate; Walters' primary goal throughout has been the directorship. Mumford, on the other hand, was at least on inquiry notice, if not actually aware, of the controversy surrounding the directorship and Walters' claims to it when she was hired. 610 F.Supp. at 725.

In affirming this relief, we express no view on the rights of Mumford against the City.

ror.[16] We note, in particular, with respect to the fourth requirement that the City and the other defendants vigorously resisted Walters' action, including the instatement remedy. It is manifest from the record that the City genuinely wished to keep Mumford and not to engage Walters. More important, at the hearing on the motion to intervene, the district court allowed Mumford to call witnesses and submit exhibits; apparently all of Mumford's proffered evidence was admitted. Mumford testified as to the process by which she was chosen and her performance as Director of Cyclorama. The district court stated that this evidence, had it been presented at the hearing on instatement, would not have altered its decision.

We do not doubt Mumford's keen interest in the relief. When one views the big picture, however, it is clear that the intervention issue is of small consequence in this appeal: although the district court denied the motion to intervene, it considered Mumford's evidence and found it unpersuasive. We agree with the district court that the propriety of the relief was based on the conduct of the City in repeatedly discriminating against Walters, and the fact that Mumford was performing her duties well does not bar Walters' relief. Accordingly, we dismiss Mumford's appeal from the district court's denial of her motion to intervene.[17]

## F. Attorney's Fees

The appellants challenge the amount of fees the district court awarded. The court found that counsel for Walters had spent 538 hours on the case, twenty-two of which entailed paralegal work. The parties stipulated to an hourly rate of $85 for counsel's fee and the court ruled that paralegal time should be compensated at $30 per hour. The unenhanced fee, therefore, was $44,-520. The district court then enhanced the fee by 35% to reflect the fact that counsel took the case on a contingent basis. *Jones v. Central Soya Co.*, 748 F.2d 586 (11th Cir.1984). The district court further enhanced the award by an additional 5% to reflect the skill of counsel, and 10% for delay in payment.

---

**16.** We review unsuccessful motions to intervene as of right under Rule 24(a) for error. Motions for permissive intervention under Rule 24(b) are reviewed to determine whether the trial court abused its discretion. Mumford claimed intervention as of right and, alternatively, sought permissive intervention. For the same reasons underlying our conclusion that the trial court correctly denied Mumford's motion to intervene as of right, we further conclude that the district court did not abuse its discretion in denying permissive intervention.

Whether intervention is sought pursuant to Rule 24(a) or (b), the determination that Mumford's motion was untimely is reviewed for abuse of discretion. *United States v. Jefferson County*, 720 F.2d 1511, 1516 (11th Cir.1983). Mere knowledge of the pendency of an action, without appreciation of the potential adverse effect an adjudication of that action may have on one's interests, does not preclude intervention. *Id.* (citing *Stallworth v. Monsanto Co.*, 558 F.2d 257 (5th Cir.1977)). Nonetheless, as in *Jefferson County*, the court here did not abuse its discretion by determining that Mumford's action was untimely because she knew or should have known that her interests could be adversely affected by Walters' suit. Walters' action was pending before Mumford was appointed. During her tenure, she attended a conference held by the City's attorneys. The district court found that Mumford was aware that the relief Walters' sought included her position. She sought intervention after the outcome of Walters' suit was announced, but before judgment was entered. As was the case with similarly situated intervenors in *Jefferson County*, Mumford waited too long.

*Stallworth* sets forth four factors that control a court's decision as to whether a motion to intervene is timely. 558 F.2d at 264–66. Mumford faults the district court for failing to apply all four of the *Stallworth* timeliness factors to her case. *See Walker v. Jim Dandy Co.*, 747 F.2d 1360, 1366 (11th Cir.1984) (when considering the timeliness of a motion to intervene, district court *must* consider all of the *Stallworth* factors). A review of the district court's order, 610 F.Supp. 730, and the record convinces us that although the court did not invoke *Stallworth* by name in its opinion, it adequately considered all of the *Stallworth* factors.

**17.** Although some commentators urge that appellate courts should affirm denials of intervention instead of dismissing the appeal, see 7A C. Wright & A. Miller, Federal Practice & Procedure § 1923 at 630–31 (1977 & 1985 supp.), precedent requires that we dismiss. *Jefferson County*, 720 F.2d at 1515, 1519.

■ The amount of attorney's fees awards are determined under the factors set out in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974), and we review the awards for an abuse of discretion. The *Johnson* court cited the following considerations as relevant to the determination of the reasonableness of the award:

1) the time and labor required;
2) the novelty and difficulty of the questions;
3) the skill requisite to perform the legal service properly;
4) the preclusion of other employment by the attorney due to the acceptance of the case;
5) the customary fee;
6) whether the fee is fixed or contingent;
7) time limitations imposed by the client or the circumstances;
8) the amount involved and the results obtained;
9) the experience, reputation, and ability of the attorneys;
10) the "undesirability" of the case;
11) the nature and length of the professional relationship with the client; and
12) awards in similar cases.

*Johnson,* 488 F.2d at 717–19.

■ That Walters' counsel undertook this case on contingency is one of the factors the district court may consider in setting the fee. *Jones v. Central Soya, supra.* [18] Appellants contend, however, that no enhancement is appropriate because the agreement between Walters and his counsel called for Walters to pay $150 per month regardless of the outcome. We disagree. The purpose of contingent fee enhancements is to encourage attorneys to undertake cases where entitlements guaranteed by federal law are at stake even though the attorney runs the risk of not

being compensated. It is obvious from the size of the unenhanced fee that the $150 per month would have done little to compensate counsel for the great time and effort spent on this case and counsel in this case assumed substantial risk. Accordingly the $150 per month agreement did not make enhancement inappropriate. *See Pharr v. Housing Authority,* 704 F.2d 1216 (11th Cir.1983).

■ Appellants further challenge the enhancement because the contingency agreement provided that counsel would receive the amount of fees awarded by the court plus one third of any noneconomic damages. Thus, according to appellants, counsel will be adequately compensated through his agreement with Walters. That the agreement will compensate counsel, however, is irrelevant to the amount appellants should pay. The enhanced fee the district court awarded is less than what is called for under the agreement and less than one third of the total award. The enhancement ordered by the district court will reduce Walters' obligation under the agreement. Appellants provide no reason why the contingent fee arrangement in this case should be treated differently than other contingent arrangements. Appellants' argument is nothing more than an assertion that all of the enhancement over the $44,520 should come from Walters' damages, and none of the enhancement should come from appellants. Appellants, however, cite no authority holding that the risk undertaken by counsel in a civil rights case must be compensated solely by the plaintiff's damage award.

■ The district court determined that, under *Johnson* factors three and nine, an enhancement was appropriate for counsel's special skill in conducting this trial. The court noted that the unenhanced fee calculated at $85 per hour did not adequately reflect counsel's superior perform-

---

**18.** We note that the Supreme Court will soon address whether a presumptively reasonable plaintiff's attorneys' fee in an analogous context may be enhanced to reflect the risk that plaintiff might not have prevailed and no fee would have been collected. *Pennsylvania v. Delaware Valley Citizens' Council,* —— U.S. ——, 106 S.Ct. 3331,

92 L.Ed.2d 737 (1986) (scheduling question for reargument). In the meantime we adhere to the "well established" law in this circuit that a contingency fee arrangement may justify the enhancement of an attorneys' fee award. *Jones,* 748 F.2d at 591.

ance. Appellants contend that this enhancement is inappropriate because counsel's skill did not reduce the number of hours necessary to prepare Walters' case. We do not believe that economy is the only reason a skillful attorney's fee may be enhanced. This was an unusually difficult case and the result achieved was extraordinary. Ordinarily, the skill of counsel is reflected in the customary hourly fee. *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 1549, 79 L.Ed.2d 891 (1984). Here, however, the district court had the opportunity to observe counsel's performance at length and noted that counsel's advocacy was superior in the midst of an emotionally charged atmosphere. The record supports this observation and the district court's analysis is persuasive. During the pendency of this appeal, however, the Supreme Court decided *Pennsylvania v. Delaware Valley Citizens' Council*, — U.S. —, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986). There, the Court stated that the lodestar figure used to calculate a fee award includes most, if not all, relevant factors comprising a reasonable fee and obviates enhancement for superior performance. *Id.*, 106 S.Ct. at 3098–99. In light of *Delaware Valley*, we remand this portion of the fee award to the district court so that it may determine whether the enhancement for superior performance is still appropriate.[19]

We further note that the case is being remanded for adjustment of the damages awarded to Walters. On remand, the district court should consider whether the downward adjustment of the damages award merits any downward adjustment in the number of compensable hours used to compute the unenhanced fee.

## V. CONCLUSION

The relief awarded in this case places Walters in an unusual position. He has, with the aid of the federal courts, achieved his lifelong ambition. The irony of Walters' use of statutes enacted in the wake of the Civil War is lost on no one.[20] Walters and the City must now live together. As did the Union and the Confederacy, the parties must bind their wounds and make peace.

Appeal No. 85–8426 is AFFIRMED in part, REVERSED in part and REMANDED for a recalculation of back pay damages. Appeal No. 85–8427 is DISMISSED. Appeal No. 85–8753 is REMANDED for reconsideration in light of the remand in No. 85–8426 and *Pennsylvania v. Delaware Valley Citizens' Council.*

---

**19.** It may be that enhancement is proper in this case because the parties stipulated to a lodestar figure with the understanding that enhancement would be sought.

**20.** We refer, of course, to Walters' reliance on 42 U.S.C. § 1981. That section's antecedents, Act of April 9, 1866, 14 Stat. 27, reenacted by § 18 of the Enforcement Act of 1870, 16 stat. 144, were the statutory precursors to the fourteenth amendment and complemented what has been referred to as the "constitutional assault on the Old South." Blackmun, *Section 1983 and Federal Protection of Individual Rights—Will The Statute Remain Alive or Fade Away?*, 60 N.Y.U.L.Rev. 1, 4 (1985).