DECISION ON APPEAL
GUERNSEY, Chief Justice.
This case presents an issue central to the implementation of the Mohegan Tribal Employment Rights Ordinance, MTO 99-2 (“TERO”) [1], namely, whether there exists a disproportionate impact threshold that must be met before the provisions of the Ordinance barring job qualifications that serve as a barrier to the employment of Native Americans[2] are invoked. For the reasons hereinafter set forth, and in light of the clearly expressed policy and procedures of the Ordinance, we hold that a finding of disproportionate impact on Native Americans as a group is not required before the Mohegan Tribal Employment Rights Commission (hereafter the “Commission”) may examine whether job qualification criteria serve as a barrier to the employment of any Native American.[3]
Procedural Background
In January 2002, the Mohegan Tribal Gaming Authority (MTGA) posted a job opening for the position of “Sports and Entertainment Support Services Manag *485 er.”[4] The “Minimum Qualifications”[5] for this position were described as follows:
Three years of progressive experience in the area of sports, entertainment and facility management. Have a working knowledge of Word, Excel and database spreadsheets for the preparation, formatting and editing of routine to complex documents. Must have an understanding of budgets and be able to track expenditures; including internal and client-related expenditures. Must be proficient in Strat-ton Warren and Infinium software. Must be able to perform multi-task projects in a diverse and busy environment. Excellent communication and organization skills required.
Record on Appeal at 21. A Mohegan Tribal member, Ms. Kim Baker,[6] along with a number of non-Native Americans, applied for this position.[7] Ms. Baker met all qualifications except for “three years progressive experience in the area of sports, entertainment and facility management.” The position was offered to a non-Native American, Robin Pelletier, already employed as an Administrator in the Sports and Entertainment Department at Mohegan Sun, who apparently met this qualification.[8]
Pursuant to MTO 99-2 § XII(A)U), Ms. Baker filed a complaint with the Department of Tribal Employment Rights, which resulted in an investigation by Ken Janus, the TERO Director.[9] As set forth in Director Janus’ TERO Investigation Report, on February 15, 2002, just prior to his request that the position not be filled while his investigation continued, Ms. Pelletier was hired.[10] Director Janus found that the failure to hire Ms. Baker constituted a violation of § VI(A) of MTO 99-2 and Mohegan Sun Hiring Policy # 3 for “failure to hire tribal/native for position”.[11]
A.Mohegan Tribal Employment Rights Commission hearing in this matter (Kim Baker v. Mohegan, Sun) was conducted on March 20, 2002, focusing on the position requirement of “three years of progressive experience in the area of sports, entertainment and facility management.” Although the identity of the non-Native American hired for this position (Ms. Robin Pelletier) had been known prior to the hearing,[12] she *486 was not given notice of the hearing.[13] Evidence was presented at the hearing on behalf of the “covered employer”, the Mohegan Tribal Gaming Authority, primarily through Robert Soper, Esq., whose testimony sought to establish that the experience required for the position was justified, inter alia, in that Ms. Pelletier would be reporting to a newly hired Director, Mr. Paul Munich,[14] and that Ms. Pelletier’s years of experience would enable her to teach and assist the new administrator in the day to day operations of the Department. Director Janus took issue with the claim that the position of Sports and Entertainment Support Services Manager was one involving management, and stated his Department’s consistent position against management experience in past cases.[15]
The Commission’s decision was issued May 6, 2002, finding that the sole issue in dispute was whether “three years of progressive experience in the area of sports, entertainment and facility management” met the definition of a “minimum qualification required by the employment position at issue” as required by MTO 99-2 § VII(A)(1). After reviewing the particular job duties as listed for a successful applicant for the position, the Commission found them to be of a “clerical, administrative or customer service nature,”[16] and held that the Mohegan Sun had failed to demonstrate that the disputed job qualification was required by a business necessity. As such, the criteria were found to serve as a barrier to the employment of a Native American [17] Ms. Baker, whose other qualifications for the position were unchallenged, was awarded as lost wages the salary differential between the position sought and her present salary, and was awarded the position of Sports and Entertainment Support Services Manager (or a comparable position, acceptable to her in her sole discretion).
The decision of the Mohegan Tribal Employment Rights Commission was appealed by the Mohegan Tribal Gaming Authority to the Gaming Disputes Trial court pursuant to MTO 95-6 and MTO 2002-4)2 Section XIV(A). The Commission’s decision was challenged on the following bases:
1. By failing to give the required notice to Robin Pelletier, an interested person, the Commission violated the provisions of MTO 2002-02 Section XII(B)(l)(a), 25 U.S.C. § 1302(8) of the Indian Civil Rights Act, and Article XIII, § 4 of the Mohegan Constitution relating to due process of law;
2. By failing to permit the examination and cross-examination of witnesses and failure to abide by the procedural requirements of MTO 2002-02, the Commission failed to follow proper procedures;
3. By failing to find that Ms. Pelletier met the “minimum qualifications for the employment position at issue” as required by MTO 2002-02 Section VII(A)(1), and by making or failing to make other findings, the Commission’s actions were arbitrary and ca *487 pricious and in excess of its authority;
4. By failing to render its decision within thirty days, the Commission lost jurisdiction over the Director’s complaint.
The trial court, Mamfredi J., in a case of first impression, attempted to ascertain the public policy of the Mohegan Tribe by an analysis of Section VII(E) of MTO 99-2, which provides:
E. Job Qualifications
Covered employers are prohibited from instituting and utilizing job qualifications criteria and/or personnel requirements which serve as barriers to employment of Native Americans, unless such criteria and/or requirements can be demonstrated to be required by business necessity. If an employer fails to prove a criteria/requirement is required by business necessity, the employer wall be required to eliminate the criterion or personnel requirement at issue. An[18] native American shall be considered qualified for employment in a position if he/she meets the minimum requirements for such position. MTO 99-2
Section VI 1(E) (emphasis added).
The trial court held that a finding by the Commission that the job qualification at issue “servejs] as a barrier to the employment of Native Americans” was a condition precedent to Commission action under Section VII(E). Absent such a finding, which was not made by the Commission in this case, the trial court held that Section VII(E) had no application, and the Commission was not empowered to look to whether or not a particular qualification was required.by.business necessity. Nevertheless the trial court examined United States Supreme Court precedent under Title VII of the Civil Rights Act of 1964 [19] in seeking to define “business necessity”, and utilizing the rationale of Griggs v. Duke Power Company, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), held that a job qualification was a business necessity if it was “reasonably related to job performance.” The trial court further held that, on the record, the challenged job qualification was required by business necessity. Central to the trial court’s decision is its conclusion that Section VIKE) requires that the job qualification at issue “functions in some way to bar Native Americans as a group from occupying the position in question.”[20] Applying the analysis of Griggs v. Duke Power Gompany, supra, the trial court held that “a job qualification must have the effect, whether intended or other-wise, of disqualifying. Native Americans for a position at a substantially higher rate than non-Native Americans for it to fall within the restrictions of the Ordinance.” [21] The failure of a single applicant to meet a job qualification was held to be insufficient to invoke the provisions of Section VII(E) in the absence of a finding that the job qualification had a disproportionate effect on Native Americans as a group.[22]
Although the trial court’s analysis of Section VII(E) is supported by the reference therein to “barriers to employment of Native Americans”, suggestive of a Griggs analysis of disproportionate group impact, we hold that the fundamentally different (in fact, almost diametrically opposed) purposes of the Civil Rights Act of 1964 and TERO (MTO 99-2), coupled with the care *488 fully designed procedures in TERO to protect the individual preference rights of Native Americans, requires the rejection of such an analysis.
DISCUSSION
/V. Disparate Impact and TERO
“The federal policy of according some hiring preference to Indians in the Indian service dates at least as far back as 1834.” Motion v. Mancari, 417 U.S. 535, 541, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974)[23] The “first major piece of federal legislation prohibiting discrimination in private employment”, Title VII of the Civil Rights Act of 1964, “explicitly exempted from its coverage the preferential employment of Indians by Indian tribes or by industries located on or near Indian reservations.” Morton v. Mancari, supra, 417 U.S. at 544, 94 S.Ct. 2474.[24] “This exemption is consistent with the Federal Government’s policy of encouraging Indian employment and with the special legal position of Indians.” Morton v. Mancari, supra, 417 U.S. at 544, 94 S.Ct. 2474, quoting 110 Cong. Roc. 12723 (1964).[25]
Against this background the Mohegan Tribe, like many other Indian tribes, adopted an ordinance declaring Native American preference as its public policy for employers and contractors operating on Mohegan land:
The public policy of the Mohegan Tribe of Indians of Connecticut (Mohegan Tribe) is to create employment and training opportunities for its Members and for other Native Americans. The purpose of this ordinance is to assist and require fair employment of Native Americans, prevent discrimination, and set forth the Native American preference requirements for employers and contractors operating on Mohegan land.
MTO 99-2, Section II. The basic policy of Native American Preference is set forth in Section VTI(A):
Irrespective of the qualification of any non-Native American applicant or employee, any Native American applicant or Native American employee who meets the minimum qualifications required by the employment position at issue whether it concerns the hiring, promotion, training, retention, recall or any other element of said employment position, shall be selected by all covered employers before any non-Native American applicant or non-Native American employee. All covered employers shall be required to comply with all job posting requirements promulgated and issued by the Human Resources Department.[26]
MTO 99-2 Section VII(A)(1). The preference expressed in this section is to be *489 applied individually to any Native American applicant or employee who meets the “minimum qualifications” for the position at issue; if these are met, the Native American applicant or employee is entitled to the preference set forth in that Section.
The term “minimum qualifications” is given a highly restrictive definition:
Minimum Qualifications means those job-related qualifications which are essential to the performance of the basic responsibilities for each employment position or contract, including any essential qualifications concerning education, training, and job-related experience but excluding any qualifications relating to ability or aptitude to perform responsibilities in other employment positions or other contracts. Demonstrated ability to perform essential and basic responsibilities shall be deemed satisfaction of necessary qualifications.
MTO 99-2 Section III. This is illustrative of a fundamental difference between Native American preference under TERO and the purpose of the disparate impact analysis of Griggs v. Duke Power Company. Under TERO, the preference exists irrespective of whether or not Native Americans as a group are at a disadvantage, whereas the Griggs analysis of disparate or disproportionate impact is used to determine whether or not to allow what might reasonably be termed a form of preference based on a prohibited basis.[27] As such, the invocation of Native American preference as set forth in MTO 99-2 is in no way dependent on the factors enumerated in Griggs.
 Inasmuch as a Griggs analysis is irrelevant to the operation of Native American preference under Section VII(A), there remains the question of why it should be relevant under Section VII(E). “A statute should be read as a whole and interpreted so as to give effect to all of its provisions.” Pintavalle v. Valkanos, 216 Conn. 412, 418, 581 A.2d 1050, (1990). Section VII(E) deals with job qualifications criteria and/or personnel requirements, and Appellee asserts that the trial court was correct in holding that a finding of disproportionate impact on Native Americans as a group was a condition precedent to a TERO challenge to any job qualifications or criteria. We do not agree, and hold that MTO 99-2 Section VII(E) was intended to reinforce, rather than dilute, the Native American preference policy of Section VII(A).
 In construing a statute, a court is “called upon to look beyond the literal meaning of the words to the history of the law, its language, considered in all its parts, the mischief the law was designed to remedy, and the policy underlying it.” Lee v. Lee, 145 Conn. 355, 358, 143 A.2d 154 (1958). As we have discussed, the policy behind TERO is the enforcement of Native American preference, not the prevention of discrimination as set forth in Title VII of the Civil Rights Act of 1964. To impose on Native American preference a barrier to discriminatory practices, created in the context of Title VII of the Civil Rights Act of 1964, is illogical in that this preference was designed, for reasons of well-established and historically justified public policy, to promote a narrowly tailored policy of discrimination.
Further, the argument that focuses on the reference in Section VII(E) to “Native *490 Americans” rather than “a Native American” ignores both established rules of statutory construction[28] and the balance of the Section, which makes clear that the test under Section VII(E) is tied to the minimum requirements for the position in question and provides that “An Native American shall be considered qualified for employment in a position if he/she meets the minimum requirements for such position.”[29]
Although the term “minimum requirements”, used in Section VII(E), is not defined in the ordinance, “minimum qualifications”, used in Section VII(A), is given the restrictive definition described earlier, and there is no indication whatsoever, in the context of this ordinance, that any difference in meaning was intended.[30] The “mischief the law was designed to remedy”, Lee v. Lee, supra, is the evasion or frustration of Native American preference by covered employers through the use of job qualifications criteria and/or personnel requirements that go beyond the minimum qualifications for the position, unless the employer can demonstrate the criteria/requirement is “required by business necessity”. MTO 9!)-2 Section VII(E). To hold otherwise would be to hold that a covered employer could escape the Native American preference provisions of Section VII(A)(1) by imposing criteria/requirements that prevent the hiring of a Native American who meets the “minimum qualifications” for the position, and defend the practice by citing a lack of statistical evidence on Native Americans as a group. This position we decline to endorse:
It is an elementary rule of construction that statutes should be considered as a whole, with a view toward reconciling their separate parts in order to render a reasonable overall interpretation; the application, moreover, of common sense to the statutory language is not to be excluded. United Aircraft Corporation v. Fusari, 163 Conn. 401, 411, 311 A.2d 65 (1972); Garbaty v. Norwalk Jewish Center, Inc,, 148 Conn. 376, 382, 171 A.2d 197 (1961). We must avoid a consequence which fails to attain a rational and sensible result which bears most directly on the object which the legislature sought to obtain.
LaProvidenza, v. State Emp. Retirement Commission, 178 Conn. 23, 29, 420 A.2d 905 (1979). Imposing the burden advocated by Appellee would serve only to. frustrate the objective, an enforceable policy of Native American preference, which the Tribal Council sought to accomplish.
We therefore hold that the trial court erred in requiring a finding by the Cona- *491 mission of disproportionate or disparate impact on Native Americans as a group as a condition precedent to Commission review of an alleged failure to comply with MTO 99-2.

B. Challenges to Commission Procedure

As a result of the trial court’s ruling that a finding of disparate or disproportionate impact on Native Americans as a group was a condition precedent to Commission review of job qualifications under MTO 99-2 Section VII(E), the Appellee’s procedural challenges to Commission’s Findings of Fact and Conclusions of Law were not considered. At the trial court level, Appel-lee based these challenges on three alleged defects in Commission proceedings: (1) that the Commission failed to give notice to an identified interested person; (2) that it failed to permit examination and cross-examination of witnesses; and (3) that it failed to render its decision within thirty days, as required by MTO 99-2 Section XII (B)(3). As a result of our conclusion that the trial court erred in requiring evidence of disparate impact on Native Americans as a group as a condition precedent to Commission review, we must now consider these challenges.
As to the contention that the Commission failed to allow examination and cross-examination of witnesses, it should be noted that MTO 99-2 Section XII (B)(2)(e) provides as follows:
Neither the formal rules of evidence nor any formal rules of procedure need be observed, but the Commission shall proceed to ascertain the facts inherent in the matter in a reasonable and orderly manner.
Our review of the transcript of the hearing before the Commission that took place on March 20, 2002[31] reveals that not only did the Chairperson of the Commission conduct the proceedings in an orderly, logical and impartial fashion, but that considerable leeway was given the Appellee in the presentation of its case.[32] We are unable to identify a single instance of the denial of the right to call and examine witnesses or to cross-examine any witness whose testimony could be construed as adverse to the position of Appellee.[33]
The challenge to the timing of the Commission’s decision is based on its failure to adhere to the time constraints of MTO 99-2 Séction XII (B)(3), which provides that the Commission:
... may either render an immediate determination or take the matter under advisement and issue its decision no later than thirty (30) working days from the date of the hearing ...
MTO 99-2 Section XII (B)(3)(a). In this case, the decision of the Commission was filed on May 6, 2002, the thirty-third working day following the termination of the Commission proceedings.
While time limitations contained in an ordinance waiving sovereign immunity are jurisdictional in nature and are strictly enforced, Long v. Mohegan Tribal Gaming Authority, 1 G.D.R. 5, 8 (1997), the requirement that the Commission issue its decision within thirty working days is, in no way tied to a waiver of sovereign immunity *492 by The Mohegan Tribe,[34] to whom MTO 99-2 clearly applies:
Unless clearly and expressly prohibited by-Federal or Trial Law, this ordinance shall apply to all employees of the Mohegan Tribe and all its entities, private employers, independent contractors, subcontractors, including those performing work for the State government, Federal government or Tribe.
MTO 99-2 Section VKB).
Appellee argues that the delay (of three days) in the issuance of its decision deprives the Commission of jurisdiction, based on its assertion that the “speedy resolution” of claims and “elimination of the offending conduct” requires the strict enforcement of this time limitation.[35] The test for whether a particular time constraint (other than one contained in a waiver of sovereign immunity) is mandatory or directory has been described as follows:
“The test we have adopted for determining whether such a statutory requirement is mandatory or directory is whether the prescribed mode of action is of the essence of the thing to be accomplished, or in other words, whether it relates to matter material or immaterial—to matters of convenience or of substance ... If it is a matter of convenience, the statutory provision is directory; if it is a matter of substance, the statutory provision is mandatory.” (Internal quotation marks omitted). 01-lev v. Oller-Chiang, 230 Conn. 828, 838-39, 646 A.2d 822 (1994). Stated another way, language is deemed to be mandatory if the mode of action is of the essence of the purpose to be accomplished by the statute; LeConche v. Elligers, 215 Conn. 701, 710, 579 A.2d 1 (1990); but will be considered directory if the failure to comply with the requirement does not compromise the purpose of the statute.
Angelsea Productions, Inc. v. CHRO, 236 Conn. 681, 690, 674 A.2d 1300 (1996). Given the absence of any indication in MTO 99-2 that failure to render a timely decision “compromises the puipose of the statute”, it is clear that the time constraint for the Commission’s decision is not the “essence of the thing to be accomplished”, Id., but rather a matter of convenience that in no way deprives the Commission of jurisdiction.[36]
The failure of the Commission to provide notice of the hearing to an “identified interested person”, however, has much more serious implications. MTO 99-2 Section XII (B)(1) is quite specific in its requirements:
(a) Upon its receipt of such request for hearing and when there is probable cause, the Commission shall forthwith direct written notice of such hearing to: the respondent; the complainant; the Director; and any and all other identified interested persons.
*493 MTO 99-2 Section XII (B)(1)(a) (emphasis added). In the instant case, the Appellant has admitted at oral argument that Ms. Robin Pelletier, who had been hired as Sports and Entertainment Support Services Manager and who (at the option of the Complainant) will lose her job under the Commission’s order, is an “interested person”. As has already been shown, her identity was well known prior to the hearing of March 20, 2002.[37]'
The Constitution of the Mohegan Tribe of Indians of Connecticut reflects a strong commitment to the provisions of the Indian Civil Rights Act of 1968:
The Mohegan Tribe, in exercising its powers of self-government, shall make no law inconsistent with the Indian Civil Rights Act of 1968 (25 U.S.C. §§ 1301-1803; 82 Stat. 77), which requires that the Tribe not ...
(h) deny to any person within its jurisdiction the equal protection of its law or deprive any person of liberty or property without the [38]process of law;
Constitution of the Mohegan Tribe of Indians of Connecticut, Article XI, Section 1(h). Prior holdings of this Court have established that the Gaming Disputes Court is a proper forum for vindicating rights created by the ICRA. Pirolli v. Mohegan Tribal Gaming Authority, 1. G.D.R. 25, 30, 1 Am. Tribal Law 571 (1998); Worthen v. Mohegan Tribal Gaming Authority, 2000 WL 35733918, 1 G.D.R. 64, 71, 2 Am. Tribal Law 410 (2000). Although the opinions at the trial court level have not been unanimous, a property interest in continued employment has been recognized by the Gaming Disputes Trial. Court. Worthen v. Mohegan Tribal Gaming Authority, 1 G.D.R. 64, 71, 2 Am. Tribal Law 410 (2000).
It follows that the giving of notice to interested identified persons is mandatory, rather than directory, and in keeping with the Mohegan Tribe’s commitment to the Indian Civil Rights Act of 1968 as well as a commitment to fairness in Commission proceedings. The Appellant argues, however, that the interests of Ms. Pelletier were adequately protected by Appellee, which argued for her retention in the disputed position, and that the failure of the Commission to provide the required notice to her was harmless error. In support of this position, Appellant cites Walters v. City of Atlanta,, 803 F.2d 1135 (11th Cir.1986), a case brought under Title VII of the Civil Rights Act of 1964 whose holding was based, in relevant part, on the interpretation of the requirements of Rule 24 of the Federal Rules of Civil Procedure dealing with permissive and as of right intervention, Walters v. City of Atlanta, 803 F.2d 1135, 1150 (11th Cir. 1986).
To the extent that Walters assumes that an employer’s position in favor of retaining an employee is a substitute allowing the employee’s intervention in a Title VII case under F.R.C.P. 24, we decline to extend such reasoning so as to render meaningless the giving of notice explicitly required by MTO 99-2 Section XII (B)(1).[39] In this case, Ms. Pelletier, the employee, had as much right to notice of the hearing as the Complainant, Respondent, or the Director. MTO 99-2 Section XII (B)(1)(a).
Section XIV (A) of MTO 99-2 provides that the review of Commission proceedings *494 by the Mohegan Tribal Court[40] shall be as follows:
The Tribal Court shall reverse the decision of the Commission only upon a finding that such decision is arbitrary and capricious or unsupported by substantial evidence.
MTO 99-2 Section XIV (A). The Ordinance further gives the Court authority to modify the order of the Commission, and if the order of the Commission is reversed or modified, the Court’s ruling must be specific:
If the order of the Commission is reversed or modified, the Court shall by its mandate specifically direct the Commission as to further action in the matter, including making and entering any order or orders in connection therewith, and the limitations, or conditions to be contained therein.
The failure to comply with the mandate of MTO 99-2 Section XII (B)(a) regarding notice, although unintentional, frustrates the clear intention of the Ordinance to abide by the Mohegan Constitution’s commitment to the Indian Civil Rights Act of 1968. Accordingly, this matter will be remanded to the Commission with direction to conduct a hearing in accordance with MTO 99-2 Section XII after the giving of notice as prescribed in MTO 99-2 Section XII (B)(1)(a). Inasmuch as this hearing will primarily focus on the standard of “business necessity” under MTO 99-2 Section VII(E), we will next consider the trial court’s holdings in this regard.

Standard of “Business Necessity ”

The trial court, notwithstanding its conclusion that a covered employer’s burden of proving a business necessity does not arise unless the job qualification at issue is found to be a barrier to Native Americans as a group, 1 O.D.R. 119, 122, nevertheless held that in proceedings before the Commission the challenged requirement of “three years progressive experience in the area of sports, entertainment, and facility management” had been shown to be a “business necessity”. Following the rationale of Griggs v. Duke Power Co., supra, the trial court held that a job qualification is a business necessity “if it is reasonably related to job performance and measures ‘the person for the job and not the person in the abstract’". 1 G.D.R. 119,122.
The term “business necessity” is not defined in the Ordinance. Its interpretation, as the term is employed by the United States Supreme Court in Griggs, supra, ranges from “a manifest relationship to the employment in question”, 401 U.S. at 432, 91 S.Ct. 849, to “a reasonable measure of job performance”, 401 U.S. at 436, 91 S.Ct. 849, to “related to job performance”, 401 U.S. at 432, 91 S.Ct. 849. The Supreme Court’s conclusion as to the intent of Congress, however, provides further evidence of the opposing purposes of Title VII and TERO:
Far from disparaging job qualifications as such, Congress has made such qualifications the controlling factor, so that race, religion, nationality, and sex become irrelevant.
Griggs v. Duke Power Co., supra,, 401 U.S. at 436, 91 S.Ct. 849. As has already been shown, the purpose of MTO 99-2 is to provide for Native American preference and to curtail job qualifications that impede such preference.
The 199! amendments to Title VII introduced the standard of “job related” and “consistent with business necessity”.[41] As *495 one court has noted, the two standards of “business necessity” and “job relatedness”, expressed in the conjunctive, approach the resulting standard from seemingly inconsistent positions:
The term “business necessity” implied the requirement of a compelling business need whereas the term “job relatedness” implied only a connection to job performance.
Donnelly v. Rhode Island Board of Governors for Higher Education, 929 F.Supp. 583, 593 (D.R.I.1996), aff'd 110 F.3d 2 (1st Cir.1997).[42]
In the case of MTO 99-2, however, the policy of Native American preference is to be applied to any Native American job applicant who meets the “minimum qualifications” for the position. MTO 99-2, Section VII(A)(1). Inasmuch as we hold that the policies behind MTO 99-2 Section VII (A) and (É) are consistent, and that the standard of “required by business necessity” to be applied under Section VII(E) is intended to promote, not dilute, the policy Native American preference under Section VII(A), it necessarily follows that for a covered employer to establish that a job qualification is “required by business necessity” it must establish that the qualification is not a subterfuge for exceeding the “minimum qualifications” for that position. Given that the “minimum qualifications” for a position are those “essential to the performance of the basic responsibilities for each employment position or contract, including any essential qualifications concerning education, training, and job-related experience a[43] standard of “reasonably related to job performance” is insufficient to protect the policy behind MTO 99-2.
In view of our holding that the Mohegan Tribal Council has enacted a comprehensive, consistent procedure for the implementation and protection of the policy of Native American preference, to require a covered employer under Section VII(E) to show anything less than a compelling business necessity for job qualification criteria that serve as a barrier to the employment of a Native American applicant would be to undermine the purpose and functioning of the entire Ordinance.[44]
Accordingly, the judgment of the trial court will be reversed and the case remanded to the Mohegan Tribal Employment Rights Commission with direction to conduct a hearing pursuant to MTO 99-2 Section XII, as amended, after appropriate notice to the complainant, respondent, the Director, and any and all other identified interested persons, including Ms. Robin Pelletier, at which hearing the respondent (and other identified interested persons, if appropriate) shall have the burden of proving by a preponderance of the evidence that the job qualification challenged by the *496 Director is.,required by a compelling business necessity.
In the event that the Commission determines that there exists a violation of MTO 99-2, under the standards set forth-above, Section XII (B)(3)(b) provides as follows:
... [T]he Commission shall impose one or a combination of the sanctions set forth in Section XV of this Ordinance and may order such person to take such corrective actions as are deemed necessary to remedy any harm caused by the noncompliance at issue.
MTO 99-2 Section XII (B)(3)(b).
Among the remedies which the Commission is authorized to impose are the following:
D. Imposition of monetary damages to compensate any person harmed as a result of noncompliance at issue.
[[Image here]]
F. Imposition of any other equitable remedy permitted by law.
[[Image here]]
I. Such other and further [relief] and/or sanctions as the Commission may deem just and proper to alleviate, eliminate and/or compensate for any violation.
MTO 99-2 Section XV (D)-(I).
In proceedings before the trial court, Appellee argued that if the Commission’s decision were to be upheld, and the job qualification at issue determined not to be required by business necessity, the order of the Commission awarding the position to the Native American applicant, Ms. Kim Baker, together with back pay, was not appropriate. Appellee argued that the po-sitian should be re-posted so as to allow the application by other Native Americans who might then qualify to be considered for the position.
There is no question that the Commission had the authority to award the position to Ms. Baker under the provisions of MTO 99-2 Section XV (D)-(I) quoted above. Nevertheless, it does not appear that this issue was specifically considered by the Commission at the hearing of March 20, 2002 or in its Findings of Fact and Conclusions of Law dated May 6, 2002. In view of the unique and central position of the Commission in the implementation of The Mohegan Tribe’s policy of Native American preference,[45] and the great deference to be accorded its conclusions, in the event that, after hearing, the job qualification at issue is determined not to be required by business necessity, the Commission shall specifically address the corrective action “best suited to remedy any harm caused by the noncompliance at issue.” [46]
Accordingly, the judgment of the trial court is reversed and the case remanded to the Mohegan Tribal Employment Rights Commission for further proceedings consistent with this opinion.

.Shortly after the occurrence of the events giving rise to this case, MTO 99-2, as amended, was repealed and replaced by MTO 2002-02, effective April 3, 2002. MTO 99-02 had previously been amended as of September, 2000 by an uncodified amendment that shifted responsibility under the ordinance from the Human Resources Department to the Tribal Employment Rights Department. The 2002 Amended Ordinance incorporated this change and added, that an appeal of the Mohegan Tribal Employment Rights Commission’s decisions shall be taken to the Mohegan Tribal Court or the Mohegan Gaming Disputes Court, as appropriate. Neither party has questioned the application of the amended procedures, which were followed throughout the history of this case. The Native American Preference provisions of the Ordinance now at issue, §§ VII(A) and (E), however, remained unchanged by MTO 2002-02.

. MTO 99 2. Section VII(E).

. Any such job qualification criteria must be eliminated by a covered employer unless such employer proves the same to be required by "business necessity", MTO 99-2, Section V1I(E).

. There is some dispute as to whether or not the posting of the job description involved the approval of the Management Board of the MTGA (which consists of the individuals serving on the Mohegan Tribal Council, MTO 95-2 § 8), and if so, what effect, if any, such approval might have. In light of the overriding policy of Native American preference as expressed in MTO 99-2, such "ratification’’ cannot supersede the express provisions of a tribal ordinance.

. For TERO purposes, "Minimum Qualifications” are defined in MTO 99-2 Section III. Section VII(A), dealing with Native American Preference, provides in relevant part: "[ijrre-spective of the qualification of any non-Native American applicant or employee, any Native American applicant of Native American employee who meets the minimum qualifications required by the employment position at issue ... shall be selected by all covered employers before any non-Native American applicant

. Ms. Baker’s qualification for Native American preference is admitted.

. See Record on Appeal at 23-24.

. There was some question as to this in the hearing before the Commission, see Record on Appeal at 58, but this appears to have been resolved. See Record on Appeal at 23, 58.

. See Record at 18-20.

. Record at 16-17.

. Id. At 17.

. See TERO Investigation Report dated February 21, 2002, Record at 16-17, and Transcript of TERO Commission Hearing, Record at 36.

. This was conceded by the Mohegan Tribal Employment Rights Commission in proceedings before the Trial court and on appeal, which nevertheless asserted that she was effectively represented by the MTGA at the Commission proceedings.

. Although Mr. Munich prepared the job description, Record at 45, he did not testify before the Commission as to the position re-quirernents, his statements being extremely limited. See Record at 52-53, 79.

. Record at 73.

. Record at 87.

. Id.

. So in original. See footnote 29, infra.

. 42 U.S.C. §§ 2000e, et seq.

. 1 G.D.R.119, 121

. 1 G.D.R. 1.19, 122

. Id.

. Morton v. Mancari, supra, contains a listing ot various types of Indian preferences enacted by Congress. Id. at n. 7-FN11.

. “Nothing contained in this subchapter shall apply to arty business or enterprise on or near an Indian reservation with respect to any publicly announced employment practice of such business enterprise, under which a preferential treatment is given to any individual because he is an Indian living on or near a reservation.” Civil Rights Act of 1964, Section 703(b). Section 701(b) excludes “an Indian Tribe” from the Act’s definition of “employer.”

. In Morton v. Mancari, supra, die Supreme Court held that Indian preference for qualified Indians under the Indian Reorganization Act of 1934, 25 U.S.C. § 472 was not repealed by the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e-16(a) (1970 ed. Stipp. II).

. “Unless clearly and expressly prohibited by Federal or Tribal Law, this ordinance shall apply to all employees of the Mohegan Tribe and all its entities ...” MTO 99-2 Section VI B.

. It should be noted that, outside the purview of Native American preference expressed in TERO, The Mohegan Tribe has promulgated a firm anti-discrimination policy in MTO 2002-04, the Mohegan Tribal Discriminatory Employment Practices Ordinance. This opinion does not mean to suggest that in cases in which MTO 2002-04 applies (Le., non-TERO cases), federal employment law precedent would be inapplicable.

. "Words importing the singular number may extend and be applied to several persons or things, and words importing the plural number may include the singular”. Conn. Gen.Stat. § 1-1(1). "The General Statutes of Connecticut, as may be amended irorn time to time, are hereby adopted as and declared to be the positive law of the Mohegan Tribe for application by the Gaming Disputes Court, except as such statutes are in conflict with Mohegan Tribal Law.” MTO 95-4 Section 301(b).

. MTO 99-2 Section VII(E). Whether the first words of the sentence were intended to be "A Native American" or “Any Native American”, it is clear that the job qualifications are at issue with respect to a single Native American applicant.

."Qualification” has been defined as "the possession of qualities or properties (such as fitness or capacity) inherently or legally necessary to make one eligible for a position or office, or to perform a public duty or function ...” Black’s Law Dictionary, Seventh Ed., 1999, at 1253. "Requirement”, not defined in Black’s, has been defined as “something required . .. necessity . . . something essential to the existence or occurrence of something else; condition [failed to meet the school’s requirement for graduation] ..." Merriam Webster Collegiate Dictionary, Tenth Ed, 1997, at 995.

. Record at 82.

. Before the Commission, Appellee’s case was presented for the most part through the unsworn testimony of Attorney Robert Soper, part of whose narrative might have been based on personal knowledge and part of which was certainly hearsay. The giving of evidence by counsel is a procedure that is not recommended.

.It should be noted that Appellee did not brief this argument in proceedings before the trial court.

. MTO 99-2 Section XIX reaffirms that, except as expressly provided in MTO 99-2, nothing therein shall be construed to be a waiver of the sovereign immunity of The Mohegan Tribe or as a consent to suit.

. Appellee does not address the inevitable result of the implementation of its argument, which is that there would either be no resolution of the claim or one delayed until further Commission proceedings could be convened.

.Compare MTO 99-2 Section XII (B)(3)(a) with Section 11-19 of the Connecticut Practice Book, which provides that if a Superior Court judge does not decide a short calendar matter within 120 days from the date of submission, either party may file a motion for reassignment of the matter to another judge or referee.

. See footnote 12.

. Presumably the substitution of “the” for “due” was unintended.

.The holding in Walters was based on an interpretation of Rule 24, and not on any explicit notice requirement of Title VII. Walters v. City of Atlanta, 803 F.2d 1135, 1150 (1th Cir.1986).

. See footnote i.

. 42 U.S.C. § 2000e-2(k)( 1 )(A)(i). It should be noted that MTO 99-2, rather than using the more lenient standard of “consistent with *495 business necessity”, requires that the qualification be “required by business necessity.” MTO 99-2 Section VII(E).

. The opinion by the 1st Circuit does not find it necessary to reach the District Court’s discussion and holding related to the term “business necessity”.

. MTO 99-2 Section III.

. Appellant has argued that the term "business necessity" should be interpreted as “indispensable for the functioning of the employer's business." This ignores the multitude of judicially crafted definitions of "business necessity” as well as the non-equivalence of the terms under Connecticut law, at least in the context of necessary versus indispensable parties. Sturman v. Socha, 191 Conn. 1, 6-7, 463 A.2d 527, (1983). Although we decline to adopt this standard of indispensability, our holding is intended to reinforce that the need for the challenged job qualification must be compelling, not merely that the job qualification be reasonably related to job performance.

. MTO 99-2 Section V(C).- .

. MTO 99-2 Section XII (B)(3)(b) and Section XV. It is not meant to suggest that the Commission's remedy, as ordered, was in any way inappropriate in the event that Ap-pellee fails to establish that, the job qualifica-lion at issue is required by business necessity; rather, that this issue cannot properly be considered on appeal without having been specifically addressed by the Commission in its proceedings.